E. E. BLACK *v.* E. J. LORD, L. L. McCANDLESS AND JAS. S. McCANDLESS, COPARTNERS DOING BUSINESS UNDER THE FIRM NAME AND STYLE OF E. J. LORD, CONTRACTOR.

No. 1611.

APPEAL FROM CIRCUIT JUDGE FIRST CIRCUIT.
HON. R. J. O'BRIEN, JUDGE.

SUBMITTED MARCH 5, 1926.                    DECIDED JUNE 3, 1926.

PERRY, C. J., LINDSAY AND BANKS, JJ.

PARTNERSHIP—*what constitutes.*

When two or more parties enter upon a business enterprise for profit under an agreement that they shall be coparticipants in its management, co-owners of the property and equipment

*Opinion of the Court.*

acquired for its prosecution and co-owners of the profits derived from it they are copartners in the business.

CONTRACT.

In a contract between an employer and an employee by which it is agreed that the employee shall receive as part of his compensation a ten per cent interest in the equipment purchased by the employer during a certain period the employee's interest in such equipment is not in any way affected by the fact that the equipment is paid for with money borrowed by the employer.

SAME.

In such contract, when it is also agreed that the employee shall receive "ten per cent of the net profits," he is only entitled to such percentage of the profits derived from the business as a whole and not to a percentage of the profits of any specific work done by the employer.

OPINION OF THE COURT BY BANKS, J.
(Perry, C. J., dissenting in part.)

This is an appeal from an interlocutory decree. On the 28th day of April, 1923, the complainant brought his bill of complaint against the respondents praying for an accounting, discovery and other equitable relief. The pertinent portions of the bill are that the complainant entered into a contract of employment with the respondent E. J. Lord, who was at the time a copartner with the other respondents in a general contracting business, under the terms of which he was to receive as compensation for his services ten per cent of the net profits derived from each contract for construction work undertaken by respondents; that he was also to receive a ten per cent interest in all equipment purchased by the respondents in connection with their business during the term of the employment. The respondents deny the partnership and deny that the contract between Lord and complainant, so far as profits are concerned, is correctly stated in the bill of complaint. They admit that there was a contract between Lord and complainant but allege that by its terms the complainant was to receive ten per

cent of the net profits derived from the business as a whole during the term of complainant's employment. They admit that complainant was also to have a ten per cent interest in the equipment purchased during that period. The court below decided all the issues in favor of the complainant and entered a decree accordingly.

So far as the respondents L. L. McCandless and Jas. S. McCandless are concerned the question that lies at the very threshold of this suit is whether there was, during the time the complainant was employed under such agreements as he had with Lord, a partnership between themselves and Lord. If there was such relation then under the general law governing the power of a partner to bind his copartners in matters relating to partnership affairs they as well as Lord became obligated to the complainant. On the other hand, if there was no such partnership agreement the interest of the McCandlesses in the questions involved in this suit is quite otherwise. It appears from the record that in December, 1918, the respondents L. L. McCandless and Jas. S. McCandless became associated with E. J. Lord in the contracting business which Lord was then conducting. The contract between the McCandlesses and Lord was not at that time reduced to writing but rested entirely in parol. Subsequently, on the 22d day of December, 1921, the terms of the agreement under which they had theretofore been operating were put in written form. This contract was introduced in evidence at the trial below and is now before us. According to the evidence it is in all its essential elements the same as the prior oral agreement. It is therefore evidence of what the prior oral agreement was and from it we may determine whether the McCandlesses were copartners with Lord on January 1, 1919, at which time the first contract between Lord and the complainant became effective. The contract is as follows:

"This memorandum of agreement made this 22nd day of December, A. D. 1921, by and between L. L. McCandless and J. S. McCandless (hereinafter called the 'First Parties') and E. J. Lord (hereinafter called the 'Second Party') all of Honolulu, City and County of Honolulu, Territory of Hawaii; Witnesseth:

"That whereas the Second Party is engaged in the business of general contracting in the Territory of Hawaii and has in the past required and will require financial assistance from time to time in connection with said contracting business;

"And whereas the First Parties have been and are willing to assist the Second Party financially, and otherwise, under certain terms and conditions;

"Now therefore it is agreed by and between the parties hereto as follows:

"1.  The First Parties will use their best endeavors to enable the Second Party to secure the necessary contract bonds on all suitable contracts which may be procured by the Second Party, the suitability of such contracts, however, to be subject to the sole determination of the First Parties, and such contracts to be subject to their approval.

"2.  The First Parties will make necessary advances for payrolls, equipment and soforth on existing and further contracts held by the Second Party, but the First Parties shall have the sole right to determine when in their discretion any such advances are necessary.

"3.  The First Parties shall have the right to approve or disapprove of any purchases, payments, or expenditures, made or incurred by the Second Party in connection with any of such contracts, and to approve or disapprove of the Second Party entering into any contracts for construction, including wharves, roads, buildings, or any other form of general contracting work.

"4.  The Second Party shall not enter into any such contracts without the written permission of the First Parties, and shall not make any such payments or expenditures without their written approval.

"5.  The First Parties shall be entitled to, and shall receive, one-half the net profit on all work done by the

Second Party under all contracts in which the First Parties are in any way interested, and shall receive, and shall be entitled to, and shall have a one-half interest in all the road equipment or other contracting equipment which has been paid for or purchased by the Second Party, or in the name of the Second Party, since December 17, 1918, or which shall be purchased by or in the name of the Second Party during the pendency of this agreement.

"6. It is hereby agreed by and between the parties hereto that inasmuch as the First Parties have assumed or paid certain sums (appearing on the books of the First Parties) over and above all the receipts from certain contracts held by the Second Party since December 17, 1918, said sums being on account of losses sustained by the Second Party under said contracts, now, therefore, before any net profits hereunder are divided the said net profits, if any, accruing upon any contract or contracts since December 17, 1918, or now, or during the term or any extension hereof, held by the Second Party, and financed wholly or in part in any way by the First Parties, shall be applied towards the repayment to the First Parties of any such losses.

"7. Whereas it was and became necessary for the First Parties, in order to enable the City and County of Honolulu to secure sufficient funds to award the contract for the second unit of the Kamehameha Highway improvement, to the Second Party, pursuant to his bid, to purchase certain of the territorial loan fund bonds issued in connection with said second unit of the Kamehameha Highway, and

"Whereas, it may become necessary or advisable for the First Parties to dispose of said bonds prior to the completion of the contract for said second unit, and/or prior to the termination of this agreement. Now, therefore, it is agreed that any losses incurred by the First Parties by reason of the purchase and sale of said bonds, or any part thereof, (and of the necessity or advisability of such sale, the First Parties shall be the sole judges) together with the difference between the interest paid by said bonds, and the interest paid by the First Parties for

money borrowed by them to purchase said bonds, shall be considered and figured as a part of the total cost of the work under said contract, and shall be repaid before any division of profits between the parties hereto.

"8. It is further agreed that the First Parties shall be entitled to, and shall receive, interest due and payable semi-annually at the rate of seven per cent (7%) on all advances heretofore or hereafter made by them on or in connection with any contract covered by or intended to be covered by this agreement, such interest to run from the date of each advance, and to be considered and figured as a part of the cost of the work, to be repaid before any division of profits between the parties hereto.

"9. It is further agreed that the Second Party shall be entitled to and shall receive a salary of Five Hundred Dollars ($500.00) per month, to be considered and figured as a part of the cost of the work, and to be paid to the Second Party before any division of profits between the parties hereto.

"10. It is further agreed that upon the termination of this agreement by death of any of the parties hereto, or otherwise, and upon an accounting and inventory then to be had, if the amount of the advances and payments made by the First Parties since said December 17, 1918, shall not have been fully repaid to the First Parties, then, and in such case, the Second Party and his estate shall be obligated to repay to the First Parties and their respective estates such sum as shall then be found to represent the difference between the amount of such un-repaid advances and payments and fifty per cent (50%) of the then undivided profits, if any, plus fifty per cent (50%) of the value of the plant and equipment as specified in paragraph (5) hereof. That is to say, if, at such date, for example, the books of the parties shall show that the First Parties have not up to that time been repaid say Fifty Thousand Dollars ($50,000) for advances so made as aforesaid, and the said books shall show cash and/or bills receivable amounting to Twenty Thousand Dollars ($20,000), and the plant and equipment shall be worth and be sold for Twenty Thousand Dollars ($20,000) making a total of Forty Thousand

Dollars ($40,000), then the Second Party and his estate shall owe the First Parties the sum of Ten Thousand Dollars ($10,000). On the other hand, if the said cash and/or bills receivable shall amount to say, Thirty Thousand Dollars ($30,000), and the plant and equipment to Thirty Thousand Dollars ($30,000), then, in such event, the First Parties shall be entitled to Five Thousand Dollars ($5,000) and the Second Party to a like amount, the understanding of this agreement being that in case of termination hereof as aforesaid, the assets shall be turned into cash as soon as may be, and the indebtedness paid or profits divided depending upon the amount of cash then received.

"11. It is expressly understood and agreed by and between the parties hereto that nothing in or by virtue of this agreement shall constitute or be construed to constitute the relation of co-partnership between the First and Second Parties, and that the First Parties shall in nowise be responsible or shall be obliged to contribute towards any losses which may have or may hereafter accrue under or by virtue of any contracts held or to be held by the Second Party.

"12. This agreement shall terminate at the end of one year from the date hereof unless renewed in writing prior to that time. Upon the expiration, or any sooner termination hereof, an accounting shall be had between the parties hereto and a proper adjustment made on the basis of said accounting."

If under its terms the sole understanding of the parties of the first part (the McCandlesses) and their sole connection with the business in which they became interested was to use their best endeavors to secure contracts for the party of the second part (Lord) and to secure contract bonds for him and to advance money to him for pay rolls and the purchase of equipment and other purposes, and if it was agreed that the parties of the first part should receive as compensation merely for such services and advances one-half of the net profits derived from the business we would have serious doubts as to

whether the relation of partnership was created by the contract. Under such circumstances it might well be questioned whether there was any other relation between the parties than principal and agent and debtor and creditor. But the interest it was agreed the parties of the first part should have in the property to be acquired for use in the business which they undertook to finance and the plenary control they were given over its management are entirely inconsistent with the idea that they were to receive one-half of the profits merely as compensation for their services as the agents and financial supporters of the party of the second part. By the terms of the agreement they are given the power to determine what contracts should be entered into; they are given the power to determine when in their discretion any advances for pay rolls, equipment and other purposes are necessary to be made; they are given the power to approve or disapprove any purchases, payments or expenditures to be made in connection with any of the contracts that may be entered into and to approve or disapprove of the second party's entering into any contracts for wharves, roads, buildings or any other form of general contract work; they are given the power to forbid the second party from entering into any such contracts or making any such payments or expenditures without their written approval; they are entitled to one-half of the net profits derived from the business and to a one-half interest in all the road equipment or other contracting equipment purchased in connection therewith during the pendency of the agreement. These are not the limited rights and powers that are usually conferred upon mere agents or even creditors but are the higher functions and distinguishing characteristics of ownership. By the very terms of the contract the respondents became co-owners of the business in which they embarked and coparticipants in its management and

cosharers in its profits and co-owners of the physical property acquired and used in its prosecution. These are the strongest indicia of partnership. It is futile to attempt to destroy their probative force by writing into the agreement that the parties are not partners or by providing that only one of them shall be responsible for losses. It is not for the parties to declare the import of their agreement but for the law.

The parties of the first part, being no doubt men of large means, agreed to put into the enterprise such funds as they deemed advisable and for this it was agreed they should receive seven per cent interest on the money advanced. The party of the second part, being experienced in the business of contracting, was to devote his services to the work undertaken and for this it was agreed he should receive $500 per month. It was contemplated of course that the business would be successful and the parties of the first part would get more out of it than merely the interest on their money and the party of the second part would get more out of it than a monthly salary of $500. In other words, they expected profits and this expectancy was at least one of the incentives to their agreement. These profits, if realized, would of course be the fruit of their combined contributions of money, energy and business acumen and would be their joint property. It was therefore agreed that they should share them equally, that is, one-half to the parties of the first part and one-half to the party of the second part. These profits are no more compensation to the McCandlesses for the money advanced by them and the performance of their other obligations than they are compensation to Lord for the services rendered by him. They represent the net earnings of a common enterprise in which the parties were actively engaged as principals and in which each of them has a proprietary interest.

So far as their ownership is concerned the profits are not different in character from the machinery and other equipment in which it was agreed that the parties to the contract should have a proportionate interest. If they are co-owners of the equipment, which is beyond question, they are likewise co-owners of the profits.

For the foregoing reasons we are of the opinion that during the time the complainant was employed under his contract with Lord the relation of partners existed between L. L. McCandless, Jas. S. McCandless and E. J. Lord and therefore all the respondents are bound by said contract.

On August 19, 1919, the complainant dictated the following letter, which was typed by his wife and signed by Lord:

"Honolulu, T. H., Aug. 19, 1919.

"Mr. E. E. Black
"1640 Dole Street
"Honolulu, T. H.

"I hereby agree to pay you Two Hundred Fifty Dollars ($250) per month and Ten Percent (10%) of the net profits and a Ten Per Cent (10%) interest in all equipment purchased during the period from the commencement of the Richards Street Improvement to July 1st 1920.

(Signed)    "E. J. Lord."

If this letter contains all of the terms of the agreement between the complainant and Lord and if it is free from ambiguity we may ascertain from it alone upon what basis the complainant's rights in this suit are to be determined.

At the time the letter was written the respondents were engaged in a general contracting business. The complainant had been in their employment as assistant engineer and foreman under an agreement that had termi-

nated on or about July 1, 1919. It was mutually desired that he should remain in the employment of the respondents and the purpose of the letter was to state the agreement as to his compensation. It is clear that he was to receive $250 per month. The evidence shows, however, that subsequently this amount was increased to $300. It is equally clear that he was to have a ten per cent interest in the equipment purchased and used by the respondents in connection with their construction contracts during the period from the commencement of the Richards Street improvement to July 1, 1920. By mutual consent the complainant continued his services until May 18, 1922. On this date a disagreement arose between the parties concerning the interpretation of their contract and the complainant's rights under it. This disagreement resulted in a termination of their relations.

It is contended by respondents that complainant's interest in the equipment was limited to equipment that was paid for. The answer to this contention is that the evidence shows that all the equipment was paid for. It is also contended by the respondents that a portion at least of the equipment was paid for with borrowed money and that in this equipment the complainant has no interest. With this contention we do not agree. There is nothing in the letter from which this conclusion can be drawn. According to the letter complainant is entitled to a ten per cent interest in all the equipment purchased during the period mentioned. It is immaterial therefore, so far as the complainant's rights are concerned, whether the equipment was paid for with borrowed money or otherwise. He was also to receive "ten per cent of the net profits."

It is the contention of the complainant that previous to the letter of August 19 it had been orally agreed between himself and Lord that so far as his interest in the

profits was concerned it should be the same as under their prior agreement. In other words, he claims that the letter does not fully state the agreement between himself and Lord. By the terms of this prior agreement, which had already expired, the complainant was to receive as part of his compensation ten per cent of the profits on each of two separate contracts, namely the Iwilei contract and the Alapai Street contract, under which the respondents were doing certain construction work for the City and County of Honolulu. Under *this* agreement, if the respondents made a profit on one of these two contracts and sustained a loss on the other, the interest which complainant had in the profits of the successful contract was not to be diminished or destroyed by the loss sustained on the unsuccessful contract. In testing the strength of the complainant's contention in regard to his interest in the profits under the new agreement it must be borne in mind that he was the author of the letter in which the new agreement is set forth. The presumption therefore is very strong that if it was agreed that his interest in the profits was to be computed on the same basis as in the prior contract he would have so stated in the letter. It is most improbable that he would have left such an important feature of his compensation to be proven by parol evidence. So strong is this presumption that nothing short of clear and convincing evidence is sufficient to overcome it. After a careful examination of the evidence introduced in the court below it is our opinion that the agreement between the complainant and Lord was not otherwise than as expressed in the letter of August 19. We shall therefore construe this letter without reference to the prior contract.

There is nothing in the letter from which the inference can be drawn that the complainant is entitled to an interest in the profits derived from such contracts as were

profitable without reference to losses sustained on other contracts. He is entitled to "ten per cent of the net profits" during the term of the contract.

In the absence of explanatory or qualifying words, the natural and reasonable interpretation of the language used is that he was entitled to ten per cent of the net profits earned by the business in which the respondents were engaged during the term of his employment. If the profits on some contracts were overbalanced by losses on others there would be no profits from the business and therefore nothing to which the complainant could look for that part of his compensation. If, on the other hand, the profits derived from some of the contracts were greater than the losses sustained on others the business would show a net profit in which he would have an interest of ten per cent.

It appears from the evidence that subsequent to the time when complainant left the respondents' employment the books of account of E. J. Lord were audited by the Henry Davis Audit Company of Honolulu. This audit was made at Lord's expense and with the complainant's consent. According to the auditor's report the complainant had received $1513.34 more than he was entitled to under his contract with Lord. It is claimed by the respondents that complainant, having consented to the audit, is bound by the result and therefore has no right to an accounting in this suit. With this contention we cannot agree. While it is true the complainant consented that the audit should be made he did not agree that he would acquiesce in its results. When the report of the audit company was made the complainant dissented from it, which he had a perfect right to do. His mere consent that the audit should be made certainly did not estop him from objecting to the findings and conclusions of the auditor.

Perry, C. J., dissenting in part.

We agree with the conclusion of the circuit judge except in his construction of the contract between complainant and Lord. In this respect we think there was error. The case is therefore reversed and remanded with instructions to the court below to enter a decree in conformity wth this opinion.

*Brown, Cristy & Davis* for complainant.

*Huber & Kemp* for respondent E. J. Lord and *Smith & Wild* for respondents L. L. and Jas. S. McCandless.

OPINION OF PERRY, C. J., CONCURRING IN PART AND DISSENTING IN PART.

I concur in the following conclusions: that the contract of August 19, 1919, as expressed in the letter of that date from respondent Lord to the complainant (exhibit K) was separate and distinct from the contract relating to the Alapai Street and Iwilei jobs and is not to be regarded as a renewal or extension of the earlier agreement; that the net profits referred to in the contract of August 19, 1919, a percentage of which is thereby secured to the complainant, are the net profits of the business as a whole during the period specified in that contract and are not the net profits of any one or more separate contracts performed during that period; that the equipment referred to in the same contract, a percentage of which is secured to the complainant, is all of the equipment actually purchased by the respondent Lord during the period named irrespective of whether it was paid for by respondent Lord with money that was borrowed for the purpose or with other moneys on hand (the undisputed evidence being that all of the equipment purchased during the period in question was wholly paid for by the respondent Lord, no question arises as to whether equipment not paid for or only in part paid for was subject to the percentage in favor of the complain-

ant) ; and that it does not in any wise appear from the evidence that the complainant has estopped himself from seeking an accounting in a court of equity.

I dissent upon the subject of whether there was a partnership between the two McCandless brothers on the one hand and the respondent Lord on the other.

Much of the law of partnership, in so far as it is involved in the case at bar, has been definitely laid down in former decisions of this court. In *Barnes* v. *Collins*, 16 Haw. 340, 342, 343, this court said: "What constitutes a partnership is a matter of some diversity of opinion, but in general it may be said that, according to what is called the modern doctrine, a partnership exists where the parties have contracted to share, as common owners or principals, the profits of a business and that whether an agreement creates a partnership or not depends upon the intention of the parties. But by the intention of the parties is meant, not what they call or consider the relation into which they enter, but what the relation is in legal effect. The parties may expressly agree that there shall be a partnership and yet such agreement will be ineffective if the specific stipulations do not establish a partnership as matter of law, and on the other hand they may expressly agree that their relation shall not be that of partners and yet it may be such as matter of law. Perhaps there is no single element that will necessarily show as a matter of evidence that a partnership was intended. Even an express agreement that the parties shall share in the profits and losses will not, it is said, necessarily establish a partnership, but such an agreement would be strong presumptive evidence of a partnership, and even an agreement to share in the profits with no agreement as to the losses would be presumptive evidence of a partnership. If the right to share in the profits is merely by way of compensation in lieu of salary

or wages for services performed or of interest for money loaned or of rent for land or of compensation for acting as agent and not by virtue of ownership of the profits, there is not a partnership. The natural inference is, in the absence of a contrary showing, that if one has a right to share in the profits it is because he is a co-owner of the profits. If in addition to a right to share in the profits there is also a liability for losses or expenses the case is greatly strengthened, for agents or servants or loaners of capital are not usually liable for losses or expenses. Of course there need be no partnership name, nor need it be stipulated that there shall be a partnership, nor is it necessary that the partners should understand or realize what the legal consequences of their agreement will be. The question is whether that which they have agreed upon constitutes a partnership as matter of law; that is, did they agree to become co-owners of the profits?" These principles were enunciated after careful consideration. No good reason appears for re-examining the conflicting decisions in other jurisdictions. While it has been thus definitely decided that a partnership exists where the parties have contracted to share, *as common owners or principals,* the profits of a business, it has also been decided and with equal definiteness that if the right to share in the profits is merely by way of interest for money loaned there is not a partnership.

The agreement of the parties in the case at bar was reduced to writing (exhibit L), was entirely unambiguous and is not subject to explanation by parol evidence. It abounds in indications, as it seems to me, that a partnership was neither intended nor formed. The parties have clearly said in the very agreement, "It is expressly understood and agreed by and between the parties hereto that nothing in or by virtue of this agreement shall constitute or be construed to constitute the relation of copartnership

between the first and second parties"  (the first parties being the respondents, McCandless brothers, and the second party being the respondent E. J. Lord). This declaration, it is true, is not conclusive upon the court for if, as held in *Barnes* v. *Collins,* the parties entered into stipulations which in the eyes of the law made them partners, they became partners even though they mistook the legal effect of their acts; but the statement quoted is at least one indication of what the parties intended and hoped to effect. The document bears upon its face strong evidence that it was prepared by an attorney and not by a layman. Did the parties and the attorney misunderstand the effect of the stipulations? In my opinion, they did not.

The first recital is that "the second party is engaged in the business of general contracting in the Territory of Hawaii and has in the past required and will require financial assistance from time to time in connection with said contracting business." This is a statement that it is Lord, and not the McCandless brothers, who has been and will continue to be in the contracting business (the complainant's services, pay for which is sought in this suit, were rendered in the contracting business). This recital further shows that the reason for the execution of the agreement is that Lord needed financial assistance.

The second recital is that the McCandless brothers "have been and are willing to assist the second party financially, and otherwise, under certain terms and conditions." This is further evidence that the cause and object of the agreement were to render financial assistance to Lord. The document continues: "Now, therefore, it is agreed by and between the parties hereto as follows." In other words, it is as though the parties said that the reasons mentioned in the recitals are what led them to execute the agreement.

Of the actual agreements of the parties set forth in the document the first is that the McCandless brothers "will use their best endeavors to enable the second party to secure the necessary contract bonds on all suitable contracts which may be procured by the second party." There is no reference in this or any other clause of the agreement to contracts to be secured by or for the three parties. The very definite statement is that they are to be secured by and for the respondent Lord alone. The contracting business to be conducted was to be his business and not the business of the three.

The next agreement is that "the first parties will make necessary advances for payrolls, equipment and soforth on existing and further contracts held by the second party." Upon two points this provision is illuminating: first that the moneys to be furnished by the McCandless brothers to Lord are to be *advances*. While the word "advances" is perhaps capable of other interpretations under special circumstances, no reason appears for not reading it here in its ordinary acceptation. Advances ordinarily are loans, to be repaid to the lender. The language of the provision further emphasizes the view that the contracts with reference to which the loans are to be made are those held and to be held "by the second party," that is, by Lord alone.

The next agreement is that "the first parties shall have the right to approve or disapprove of any purchases, payments or expenditures made or incurred by the second party in connection with any of such contracts and to approve or disapprove of the second party entering into any contracts for construction, including wharves, roads, buildings or any other form of general contracting work," —again indicating in clear language that the purchases, payments and expenditures arising out of the contracting business are to be the purchases, payments and ex-

penditures of Lord alone and that the contracts entered into are to be entered into by Lord alone.

The next undertaking is that the "second party shall not enter into any such contracts without the written permission of the first parties and shall not make any such payments or expenditures without their written approval." This provision likewise refers merely to contracts that are to be entered into by Lord and to payments and expenditures that are to be made by him. Nowhere in the agreement is any reference made to contracts that are to be entered into by the McCandless brothers alone or jointly with Lord or to payments or expenditures or purchases that are to be made by the McCandless brothers alone or jointly with Lord.

In another provision recital is made of the fact that the first parties had theretofore assumed or paid certain sums "on account of losses sustained" by Lord under prior contracts and the parties agree that "before any net profits hereunder are divided" the net profits if any "accruing upon any contract or contracts since December 17, 1918, or now, or during the term or any extension hereof, held by the second party, and financed wholly or in part in any way by the first parties, shall be applied towards the repayment to the first parties of any such losses." This is a recital of the fact that Lord and the McCandless brothers had prior to this written agreement undertaken practically the same relations towards each other in an agreement of financing and security and is a provision that those past loans still unpaid were to be paid for by Lord out of the proceeds of his business before paying to the McCandless brothers any profits as compensation for the use of the later loans.

Another provision relates to certain possible losses to be suffered by the McCandless brothers in connection with the purchase and sale of certain bonds made necessary in

furtherance of Lord's contracting business and provides for the payment by Lord to the McCandless brothers of any such loss that may accrue to them.

In the provision securing interest of seven per cent to the McCandless brothers expression is further given to the fact that the moneys paid and to be paid by the McCandless brothers to or for Lord were all by way of "*advances,*" that is to say, were all loans.

Another provision, set forth in much detail, is that, "upon the termination of this agreement by death of any of the parties hereto, or otherwise," if it shall then appear that the advances made by the McCandless brothers to Lord shall not have been fully repaid, "then, and in such case, the second party and his estate shall be obligated to repay to the first parties and their respective estates" the amount of such advances then due and unpaid. The agreement, having provided that the McCandless brothers should be paid fifty per cent of the profits of the business and fifty per cent of the value of the plant and equipment paid for or purchased by Lord during its pendency, further provides, in its essence, that upon the termination of the agreement whether by death or otherwise, if the total of the cash on hand and receivable and of the equipment shall be less than the amount of the advances then unpaid, Lord and his estate shall be obligated to pay to the McCandless brothers the amount of the difference in addition, as I infer, to the application of all of the assets of the business to the payment of the advances; and that if the said assets shall exceed in value and amount the total unpaid advances the excess after payment of all of the advances shall be divided equally between the two sets of parties. In other words this is but another way of saying that the moneys provided by the McCandless brothers are loans to Lord to be repaid by the latter in any event and are not contributions to the

business to be subjected to possible loss. It is worthy of note in this connection that the undisputed evidence shows that at the time this contract was entered into the respondent Lord was the owner of attachable property of some considerable value.

Another express provision of the contract is that "the first parties shall in no wise be responsible or shall be obliged to contribute towards any losses which may have or may hereafter accrue under or by virtue of any contracts held or to be held by the second party." This provision throws light upon two points: one, that the contracts were to be held by Lord alone, and the other, that one of the ordinary and indispensable incidents of a partnership, to wit, responsibility for the obligations of the partnership even though incurred by another partner, was not to exist in this instance.

I can find in this agreement no language apt to express the thought that the parties were entering into the relationship known to the law as a partnership or were creating the rights in each or imposing the obligations upon each which in law constitute a partnership. On the contrary, all of the language which is used is what would be expected in an agreement concerning loans and compensation for the use of those loans. It is true that in various provisions in the contract a certain measure of control was vested in the McCandless brothers concerning certain features of the business. They were to be judges of the suitability of the contracts to be entered into by Lord and were to have the sole right to determine what advances would be necessary and to approve or disapprove the purchases, payments and expenditures; but these provisions are altogether consistent with the view that the McCandless brothers were to be mere lenders and not partners. As the undisputed evidence shows, they had suffered large losses in prior

contracts with a contractor other than Lord and certain loans to Lord in contracts prior to the date of this agreement still remained unpaid. It is not to be wondered at that they desired to have some check provided in the written agreement against the assumption by Lord of unnecessarily risky or speculative contracts. The same is to be said of the fact that, as appears from the evidence, one of the McCandless brothers showed a very close interest in the progress of the performance of each contract by Lord by daily or almost daily asking questions about and familiarizing himself with the progress of the work. This, it seems to me, was merely interest arising out of the desire to ensure the repayment of the large sums of money loaned. It may be noted in this connection that Lord's testimony stands undisputed that when Black complained to him of the daily asking of questions by one of the McCandless brothers Lord in substance, but in more forcible language, replied that it was none of McCandless' business how the work was done. Aside from the limitations already referred to, the contract gave the McCandless brothers no control whatever over the methods or the details of the performance of the contracts undertaken by Lord or over the management of the business.

There was no common ownership, by the McCandless brothers and Lord, of the business or its assets or its profits.

It is also true that the provision securing some of the profits to the McCandless brothers is simply that they "shall receive one-half the net profit" of all work done by Lord under the contracts and "shall have a one-half interest in all the road equipment" purchased by Lord, without specifying in express words that the profits and the equipment are secured to the McCandless brothers by way of compensation for use of the loans. This is

far from controlling, however, in determining whether the profits are to be received as profits or as compensation by way of interest. This expression alone is as consistent with the one view as with the other and the intent of the parties is to be ascertained from all of the provisions of the instrument. These make it clear, as it seems to me, that the share in the profits and in the equipment is purely by way of compensation for the use of advances.

In respect to sharing in the profits and equipment, the relationship between Black and Lord was very similar. Under the contract of August 19, 1919, Black was to receive a share in the profits, without any statement as to whether the net profits were to be so received by him as profits or as compensation for services. There is nothing on the face of that written agreement to clear the ambiguity on this subject; but it is obvious from the testimony adduced that the percentage was to be paid to him as compensation for his services and the decree of this court is proceeding upon that theory. No one in the case has claimed anything to the contrary. Likewise, Black stipulated that he was not to be responsible for any losses. No one claims that this stipulation failed or that he became Lord's partner.

The circuit judge, while not deciding whether Lord and the McCandless brothers were partners *inter se,* held that they were partners "as to third parties," that is, as to the complainant. My understanding of the modern and more generally accepted view is that it is not a legal possibility for two or more persons to be, upon the same facts, partners as to third parties and not partners *inter se* and that the most that can be said is that, if the true relationship of nonpartnership has been misrepresented to third parties, then, as to those third parties, the two or more are estopped from claiming that they are not

partners. "Under the modern doctrine of partnership, persons are not liable as partners to third persons, although they share the profits of a business, unless they are in fact partners *inter se* or have held themselves out as partners under such circumstances as to estop them from denying their partnership." 22 A. & E. Ency. L. 20. "Merely sharing in the profits, where third persons have not been legitimately led to believe in the existence of a partnership, does not create a partnership as to them, unless there is one in fact, or unless a party has by his acts put himself in such position that he is estopped from denying that he is a partner." *Strohm* v. *Wilson,* 10 Haw. 302, 305, 306. No evidence was adduced tending to show that any misrepresentations had been made by Lord or anyone else to Black. On the contrary, the undisputed evidence indicates that he was perfectly familiar at all times with the true relationship between Lord and the McCandlesses. Neither Lord nor the McCandless brothers are estopped from claiming that there was not a partnership. So, also, no testimony was adduced showing either that the intent of the parties was not correctly expressed on the face of the written agreement or that the latter was ever amended in any respect.