Argued July 13, reversed and remanded July 27, 1960
# GENERAL REALTY CORPORATION v.
## DOUGLAS LOWELL, INC.
354 P. 2d 396

BARNETT H. GOLDSTEIN, Judge Pro Tem.

Robert L. Dressler and E. J. Buhlinger, Portland, argued the cause for appellant. On the briefs were Buhlinger & Dressler and Arthur E. Pragg, Portland.

Thomas P. Deering, Portland, argued the cause for respondent. With him on the briefs were Frederick H. Torp and Hart, Rockwood, Davies, Biggs and Strayer, Portland.

Before McALLISTER, Chief Justice, and WARNER, O'CONNELL, GOODWIN and MILLARD, Justices.

MILLARD, J. (Pro Tempore)

This is an appeal from a decree of the Circuit Court of Multnomah county in favor of the defendant in a suit wherein plaintiff corporation, which was engaged in the business of developing and constructing residential property, is seeking to establish that a contract was entered into with defendant corporation who was engaged in a like business wherein defendant undertook to complete the development of a subdivision known as El Toro Addition located in said county, excepting certain lots, under circumstances whereby the remaining lots therein would be sold and the proceeds of sale divided between the parties in accordance with said agreement. Plaintiff further claims that this agreement has been at least partially performed and asks for an accounting. The trial court found that the contract as alleged was not established. While the official name of defendant corporation is now as stated in the caption, its name has been changed and it was formerly "McKel, Inc." and we shall hereafter refer to defendant as "McKel."

From reading the entire transcript in the light

of the pleadings we glean the following facts. Plaintiff, on May 31, 1954, by written contract, purchased the land in question consisting of about 30 acres from Thomas F. Riley and May M. Riley and in accordance with the contract caused it to be subdivided for home sites and platted as El Toro Addition consisting of 126 lots. Plaintiff was allowed to obtain a conveyance of any lot upon the payment to the sellers of $1,000 to be applied in the total purchase price. If the buyer desired, it might start construction on any lot but, as a condition, must pay $500 and then a balance of $500 at the time of conveyance. Under this arrangement plaintiff commenced the construction of twelve homes, five of which were completed and sold. The remaining seven were uncompleted and, during the early part of 1955, plaintiff being heavily indebted, found that it lacked funds to complete them. At this juncture, and in desperate need, plaintiff sought financial assistance and eventually contacted defendant's manager, Douglas Lowell, who promised to give a hand. At that time plaintiff was in need of $4,000 to apply on the Riley contract. Accordingly, defendant advanced this money and plaintiff, through its Secretary and Treasurer, C. W. Cooper, over his signature executed a receipt where the signature of Thomas Riley also appears and wherein it is stated as follows:

"April 15, 1955

"Douglas W. Lowell
5839 S.W. Hood Avenue
Portland, Oregon

"Upon receipt of Four Thousand Dollars I hereby assign my rights and interest in a real estate contract dated May 31, 1954 between Thomas F. Riley and Mary M. Riley and General Realty Corpora-

tion. The contract is covering the land known as El Toro Addition.

> "General Realty Corporation
> C. W. Cooper /s/
> C. W. Cooper
> ~~President~~ Sec. Treas"

"Frank Riley /s/

It is at this point the issue becomes clouded. From the receipt it would appear that defendant had purchased the entire interest of plaintiff in El Toro Addition. That such was not the case clearly appears from the evidence of both parties. It not only appears that defendant was to be paid back its $4,000 so advanced, but defendant actually later made claim for that amount. Defendant's manager, Lowell, testified it was an advance and was to be repaid. That other matters were discussed and agreed upon clearly appears from defendant's Exhibit 6 which has to do with the seven houses which plaintiff had started to construct and which were uncompleted. This exhibit, prepared by defendant and accepted by plaintiff and which was written on defendant's letterhead, provides as follows:

> "April 28, 1955

> "General Realty Corporation
> Portland, Oregon

> Gentlemen:

> We are prepared to take over the completion of seven houses located one each on the following lots:

>> Lot 22 and lot 7, block 5,
>> Lots 16, 17, 18, 19 & 22, block 1,
>> EL TORO ADDITION

> on the following terms:

> 1. That deed and title will be transferred on the above lots to McKel, Inc.

2. That assignment of all sales and mortgages by purchasers on the above lots be made to McKel, Inc.

3. As houses are completed and mortgages are closed on the seven above mentioned houses, all funds in and above the cost of completing these seven houses and other moneys advanced by McKel, Inc. to guarantee the payment of all bills and materials and a fee of $500.00 per house will be reimbursed to the General Realty Corporation.

4. McKel, Inc. will keep a strict accounting of all moneys paid to complete the above mentioned seven houses. The records of said disbursements can be examined by the General Realty Corporation.

5. It is further agreed that General Realty Corporation will pay all sales expenses and other expenses that are not directly charged to material and labor in connection with the completion of the houses.

6. McKel, Inc., upon instructions from the General Realty Corporation, will disburse such funds for titles, sales commissions, etcetera [sic], providing sufficient funds are available in the closing of the above transactions.

7. It is further agreed that the transfer of the rights and interests in these properties shall be made as of May 1, 1955.

"Very truly yours,
McKel, Inc.
[No signature]
Douglas W. Lowell

"DWL:h
[Handwritten]
Accepted.
    General Realty Corp.
      C. W. Cooper, Sec."

There is no question but what defendant's Exhibit 6 sets forth the actual agreement of the parties insofar as the seven uncompleted houses were concerned. It also appears that defendant was permitted without objection to re-negotiate the Riley contract after its assignment so that defendant became the contract vendee. After the signing of defendant's Exhibit 6, defendant contends no further contracts were made and that he was entitled to take the remaining 114 lots insofar as plaintiff was concerned. Plaintiff's testimony indicates otherwise. Insofar as the written evidence is concerned, it will be noted at this point that there is nothing to show just when defendant's advance of $4,000 was to be repaid. Further, defendant's manager testified that the agreements between the parties was not embodied in the receipt for the $4,000. While defendant contends and its evidence is to the effect that the contract was as set forth in defendant's Exhibit 6 and that there were no further agreements, defendant, before it had completed the seven houses, instructed and ordered its attorney to prepare another contract document. This document, upon order of defendant, was submitted to plaintiff. Defendant claims it was submitted only as a basis for future negotiations. It is difficult to see how, under defendant's theory, there was any basis for further negotiations. In any event, and after considerable delay, plaintiff signed this document and returned it to defendant who refused to sign it and terminated any further negotiations. This document, plaintiff's Exhibit 4, reads as follows:

"THIS AGREEMENT, made this     day of 1955, between McKEL, INC., an Oregon corporation, hereinafter referred to as McKel, and GENERAL REALTY CORPORATION, a corporation, hereinafter referred to as General,

## "WITNESSETH:

"McKel has entered into a contract to purchase all of that certain real estate subdivision situated in Multnomah County, Oregon, known as El Toro Addition, not previously purchased by General, and has succeeded by agreement to certain rights of General in such contract. In consideration of the funds heretofore advanced and of the mutual covenants and agreements hereof, it is agreed as follows:

"1. McKel has paid the sum of $4,000 to apply upon the obligations of General arising from the construction of certain houses on Blocks 1 and 5 of El Toro Addition, and does hereby agree with General that it will cause houses to be completed upon Lots 16, 17, 18, 19 and 22 of Block 1, and Lot 22 of Block 5, of said Addition. Upon the completion of such houses they will be sold and the net proceeds thereof divided as follows:

"First, to the costs of McKel incurred in the completion of said houses.

"Second, to the reimbursement to McKel of the $4,000 heretofore advanced.

"Third, the sum of $500 per house to McKel, as an agreed fee for its services incurred in connection therewith.

"The balance thereof to General.

"2. It is further agreed that McKel will at its sole discretion proceed with the improvement of the remaining portions of El Toro Addition, erect houses thereon and sell them in the normal course of its business. The net proceeds of such sales shall be divided between the parties as follows:

"(a) McKel shall be entitled to reimbursement of its costs in the construction of such houses. In the computation of such costs each lot shall be charged at the amount of $1,000, which shall include McKel's cost for each such lot under its contract of sale for the purchase of El Toro Addition; the cost of improvements

such as streets, water, grading, and other basic improvements, including engineering and related services, and the amount of $105 override required to be paid to Frank T. Riley in accordance with the aforesaid contract of sale. If upon completion of the project such costs shall be less than $1,000 per lot such difference shall be paid by McKel to General.

"(b) There shall be charged against the net proceeds of sale of each such house a fixed fee of $450 to McKel, a fixed fee of $100 for architectural services, and the cost of curbs and approaches attributable to each such house.

"(c) After the deduction of such costs the balance of net profits upon such house shall be paid one-third to General and the balance to McKel. McKel agrees to keep books and records reflecting the costs attributable to the project and to each house constructed in said El Toro Addition, and to permit General to inspect such books and records at its expense during normal business hours.

"3. It is understood and agreed that the parties are not joint venturers or partners and that McKel shall have sole responsibility and control for the character and time of development of El Toro Addition. McKel's sole responsibility to General shall be the payment of the amounts due General hereunder.

"IN WITNESS WHEREOF the parties hereto have caused this agreement to be executed by their respective officers thereunto duly authorized and their respective corporate seals affixed as of the date hereinabove first written.

"McKEL, INC.
By _____[No signature]_____
                                        President

GENERAL REALTY CORPORATION
By ____Leonard Harman /s/ _____
                                        President"

It is to be noted that this document not only provides for the repayment of the advance of $4,000, but also includes provisions relating to the seven houses that were uncompleted, indicating an entire agreement between the parties. While the testimony of C. W. Cooper, who carried on most of the negotiations on behalf of plaintiff and who was in charge of plaintiff's office and financing, indicated that the oral argument between the parties, with one exception hereafter noted, was in accord with this document, his evidence was uncertain in many respects particularly with respect to time. Evidently the trial judge based his conclusions upon this testimony. The testimony of Leonard Harman, who was President of plaintiff corporation and whose main duty was the supervision of actual construction, was not so confused. He testified that he was present at a conversation occurring during inspection of the land in the latter part of February and the first part of March, 1955 when Mr. Lowell, defendant's manager, Mr. Pearson, Office Manager for defendant, Mr. Cooper, Office Manager for plaintiff as well as Secretary and Treasurer, were also present and that it was at that time an agreement was reached as set forth in this document and that "nothing changed from the time we started our negotiations" except with reference to one exception heretofore referred to. In that regard he states, as well as Mr. Cooper, that the architects' fee was never mentioned but it further appears that no objection was made as to that and insofar as plaintiff is concerned it is accepted by it. We hold that the entire agreement between the parties was as set in plaintiff's Exhibit 6 as to the seven uncompleted houses and that as to the remaining 114 lots and the advance of $4,000, the agreement with reference to that was as provided

in plaintiff's Exhibit 4. The trial court attached some significance to defendant's failure to sign this last mentioned document. We regard this document not as the contract but as evidence of an oral agreement which had already been consummated. We think the reluctance of defendant in signing the agreement proferred by him may be explained on another basis. Defendant claims that plaintiff misrepresented the probable expense of completing the seven houses in that Mr. Lowell was told that they could be completed for about $40,000 and in support of that submitted in evidence a list of what defendant claimed was probable expenses which was prepared and given to defendant by plaintiff. This list, totaling $40,125.57, was entitled "Invoices Not Paid For El Toro Houses." We are satisfied that was what it was represented to be and not a representation of future expense. It does appear, however, that plaintiff's affairs were in confusion and that no doubt defendant was put to greater expense than was anticipated and possibly paid duplicate accounts. The comment of Mr. Lowell on cross examination as here related is illuminating:

"Q Now, I understand from your direct testimony that your expense, in respect to those seven houses, in effect killed the deal, so far as this profit-sharing arrangement was concerned?

"A That was part if it; yes, sir."

"Where parties agree to reduce their agreement to writing, the question arises as to whether their negotiations constitute a contract. This question usually depends upon their intention, or, as it is sometimes expressed, upon whether they intend the writing to be a condition precedent to the taking effect of the agreement. If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its

absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed. Where the terms of a contract have in all respects been definitely understood and agreed upon, the failure subsequently to embody such terms in a written contract, as agreed, does not prevent the contract, where no statutory objection interposes, from being obligatory upon the parties. In other words, where all the substantial terms of a contract have been agreed on and there is nothing left for future settlement, the fact alone that it was the understanding that the contract should be formally drawn up and put in writing does not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed. Where, however, the writing is regarded as a prerequisite to the closing of the contract, the agreement does not become binding if there has been a failure to reduce it to writing. Where it is clearly understood that the terms of a proposed contract, though tentatively agreed on, are to be reduced to writing and signed before it is complete and binding on the parties, there is no final contract until that is done." 12 Am Jur 522, Contracts § 25. See also 1 Restatement, p 33, Contracts § 26; 122 ALR 1217 et seq.

■ In applying these principles to this case it does not appear that the parties ever contemplated their writings to be a condition precedent to the taking effect of their agreements. On the contrary, their writings appear merely to record their previous contracts. For example, with reference to the agreement relating to the seven uncompleted houses Mr. Lowell testified that the "actual agreement" was entered into April 28, 1955 but that it was later accepted and transferred into a contract, apparently on the theory that the

agreement must precede the written contract. On the whole, the evidence indicates that the writings were nothing more than memorials of previous agreements and we so hold, and, as to the receipt and assignment, not even that. We find nothing indicating that it was ever contemplated that a written agreement be signed before their agreements became effective. To the contrary, it appears that defendant was the one who sought thereafter to reduce the agreements to writing for his protection.

We have not specifically referred to and enumerated all of plaintiff's various assignments of error for the reason that with the exception of the last assignment, all of them deal in one way or another with the trial court's failure to find that a contract existed in accordance with our findings here. It will suffice to say that reversible error appears.

As to the last assignment, it is contended that the court erred in not requiring a discovery and determination of profits, if any. Altogether defendant has built on 74 or 75 lots. Defendant has attempted to account for the seven houses which it completed, claiming a loss of $6,233.87, and for 30 additional houses wherein it claims a loss of approximately $23,926.73. Included in these computations is an item of $4,000 on account of its initial advance. The trial court did not settle any of these matters since it apparently took the view that further accounting was unnecessary. We, of course, take a different view and hold that further accounting will be required.

The decree of the trial court is therefore reversed and the cause remanded with instructions to proceed to an accounting in accordance with the contract as found to exist as hereabove set forth.