JAMES S. SHINN and KENNETH SHINN, a Co-partnership dba Shinn Brothers Foundation and JAMES S. SHINN, individually, Plaintiffs-Appellees, Cross Appellants *v.* EDWIN YEE, LTD., a Hawaii corporation; CONDOMINIUM HAWAII, INC., a Hawaii corporation, and EDWIN K. Q. YEE, individually, Defendants-Appellants, Cross Appellees

NO. 5540

AUGUST 24, 1976

RICHARDSON, C.J., KOBAYASHI, OGATA,
MENOR, JJ., and RETIRED JUSTICE LEWIS
ASSIGNED BY REASON OF VACANCY

216

OPINION OF THE COURT BY MENOR, J.

This is an action for an accounting predicated upon the alleged existence of a joint venture. The plaintiffs below are James S. Shinn and Kenneth Shinn, a co-partnership doing business as Shinn Brothers Foundation, and James S. Shinn, an individual (hereinafter "Shinn"). The defendants are Edwin Yee, Ltd., and Edwin K. Q. Yee, an indivdual (hereinafter "Yee"), and Condominium Hawaii, Inc.

The plaintiffs in their complaint contended that the parties had entered into a joint venture for the development of the Kahala Towers condominium project. The purported agreement called for the development, construction, and sale of condominium apartments on Bishop Estate leasehold premises held in the name of Edwin Yee, Ltd. They alleged that the defendants had wrongfully and illegally excluded them from the joint venture. Additionally, they complained that the defendants had wrongfully utilized certain joint venture assets for their own purposes and requested that these misappropriated funds be traced and a constructive trust impressed upon whatever profits may have accrued to the defendants as a result of the alleged misappropriations.

The trial court found in favor of the plaintiffs on the issue of whether a joint venture existed but denied their request for a tracing of the alleged misappropriated funds. Judgment was entered accordingly. The defendants appeal and the plaintiffs cross-appeal.

I

The initial issue to be decided on appeal is whether a joint venture relationship existed between the parties.

A joint venture is a mutual undertaking by two or more persons to carry out a single business enterprise for profit. It is closely akin to a partnership, and the rules governing the creation and existence of partnerships are generally applica-

ble to joint ventures.[1] *Kienitz v. Sager,* 40 Haw. 1 (1953). *See also Eastern Iron & Metal Co. v. Patterson,* 39 Haw. 346 (1952). It is a contractual relationship which necessarily contemplates some contribution by each of the parties of money, property, effort, knowledge, skill, or other resources to the common undertaking. As with a partnership, it is absolutely essential that there be an agreement between the parties for a joint venture and that there be a provision in the contract for their sharing, as joint venturers, of the profits of the business. *See Winkelbach v. Honolulu Amusement Co.,* 20 Haw. 498 (1911).

The existence of a joint venture agreement must be shown by the preponderance of the evidence, *Brooks v. Brooks,* 357 Mo. 343, 208 S.W.2d 279 (1947); *cf. Holmes v. Ray,* 13 Haw. 228 (1901), and its essential terms must be established with reasonable certainty. *Kienitz v. Sager, supra.* It is not necessary, however, that there be a specific formal agreement to enter into a joint venture. The contract between the parties may be express or implied, and may be proven by direct evidence, or by proof of facts and circumstances from which the agreement of the parties may be ascertained. *Ibid; James v. Herbert,* 149 Cal. App. 2d 741, 309 P.2d 91 (1957).

The trial court determined that a joint venture relationship existed between the parties, and specifically found that between December 23, 1965, and March 14, 1966, Yee and Shinn negotiated and agreed to form a joint venture for the purpose of constructing two high-rise condominium apartment buildings to be known as the "Kahala Towers;" that they were to contribute equally to the capital requirements of the project which was to be built on leasehold premises; that they were to have equal right of control over the project, except that Yee, because of his superior knowledge in this area, was to be the managing joint venturer; and that they were to share equally in the profits of the joint enterprise, except that in the final accounting Yee would be entitled to an

---

[1] By Act 17, Session Laws of Hawaii 1972, the Legislature included joint ventures within the definition of a "partnership" under the Uniform Partnership Act. *See* HRS § 425-106.

additional $121,000 as and for his managerial ability and "know-how," including but not limited to his ability to borrow money in the name of the joint venture for joint venture capital purposes and his management of the project to its successful completion.

Whether a joint venture exists generally requires the resolution of disputed issues of fact, and where the trial court, sitting without a jury, has made its factual determinations, its "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." H.R.C.P. Rule 52(a). It is for the trial court to determine whether and to what extent a witness is worthy of credit, and to give to his testimony the weight that it deserves. The court may accept or reject the testimony of a witness in whole or in part. *State v. Cannon*, 56 Haw. 161, 532 P.2d 391 (1975); *Siko v. Seguirant*, 51 Haw. 118, 452 P.2d 447 (1969); *In re Miller's Estate*, 143 Cal. App. 2d 544, 299 P.2d 1005 (1956). Accordingly, where the trial court's determinations of fact are largely dependent upon the resolution of conflicting testimony, great weight will be accorded its findings upon review. *Lopez v. Tavares*, 51 Haw. 94, 451 P.2d 804 (1969); *Shannon v. Murphy*, 49 Haw. 661, 426 P.2d 816 (1967). And while reasonable minds may fairly differ as to whether certain evidence establishes a fact in issue, yet where findings of fact are supported by substantial evidence the findings of the trial court will be sustained. *Imperial Finance Corp. v. Finance Factors*, 53 Haw. 203, 490 P.2d 662 (1971). Substantial evidence is credible evidence which is of sufficient quantity and probative value to justify a reasonable man in reaching a conclusion. *In re Charley's Tour & Transp., Inc.*, 55 Haw. 463, 522 P.2d 1272 (1974).

The trial court found that the parties entered into a joint venture agreement as of March 14, 1966. This finding is amply supported by the evidence and is not clearly erroneous.

It is not disputed that a joint undertaking was contemplated and discussed by the parties almost from the very

beginning. Neither is it disputed that meetings were held between them, relative to the joint venture, prior to March 14, 1966.

Waikaha Manor, Inc., was the owner of Bishop Estate Lease No. 11,832, which had been acquired by it for a proposed apartment project. Shinn was both a preferred and a common stockholder in the corporation, as well as a corporate director. Sometime in October, 1965, Yee asked to meet with Shinn to discuss the possibility of Yee's purchase of the lease and development rights from Waikaha Manor. At that meeting Shinn suggested to Yee that a bid of at least $500,000 would stand a better chance of success than one for a lesser amount. Yee eventually submitted a bid for $550,000, which turned out to be the highest bid. His offer was accepted by the corporation on December 22, 1965. The purchase price of $550,000 was to be paid in the following installments: $150,000 on July 1, 1967; $150,000 on July 1, 1968; $150,000 on July 1, 1969; and $100,000 on July 1, 1970. Yee executed a promissory note in accordance with the terms of purchase on March 7, 1966. Additionally, and as part of the cost of purchase to Yee, he agreed to assume certain existing obligations of Waikaha Manor amounting to approximately $126,000, and consisting essentially of back lease rentals, architects' fees, and real property taxes.

Shinn testified that following the consummation of the purchase, he met with Yee at the Foster Towers Coffee House on December 30, 1965. At that time Yee advanced the possibility of a partnership between them for the development of the Kahala Towers project. Yee admitted that he met with Shinn on a number of occasions during the months of January and February of 1966, to discuss the Kahala Towers project as a joint undertaking.

Shinn testified that he asked Yee at the initial meeting of December 30 how much his "front money" contribution was to be, and Yee advised him that it would be in the neighborhood of $100,000. Shinn made no commitment at the time, but they met again a day or two later, at which time Yee became more specific regarding the preliminary expenses.

On a sheet of ledger paper which was admitted into evidence, Yee listed down the anticipated capital requirements and calculated Shinn's one-half share to be $103,000. The items listed included the architects' fees, lease rentals, real property taxes, and interest, which Yee had agreed with Waikaha Manor to assume as part of the purchase price of the Waikaha Manor project. Yee also told Shinn that the necessary basic and interim financing for the project was already assured. He mentioned Island Federal Savings & Loan as the source of the construction funds. Shinn was still unable to commit himself, because he had first to ascertain whether he could raise his share of the necessary funds. He asked Yee for time to think it over.

According to Shinn, a tentative agreement was reached at one of their subsequent meetings in January, and it was in late February or March that he finally and firmly committed himself to the venture. This was before he made his initial capital contribution of $2500 on March 14, 1966. Shinn testified that it was agreed that he would make a total contribution of $103,000 to the joint venture; that he and Yee would share equally in the profits of the venture; and that Yee was going "to run the show."

Shinn in early March began taking concrete steps to raise the amount which he was committed to contribute to the capital requirements of the project. He contacted Royal Grove Hotel, Inc., with whom he had other business arrangements, and the corporation responded with a letter, dated March 7, 1966, assuring him that it would make available to him not less than $53,000 on or before June 30, 1966. Shinn explained that pursuant to his arrangements with Yee his share of the capital contributions had to be paid into the joint venture by July, 1966. Yee himself had given Shinn an assist in this area. Earlier he had suggested to Shinn that Shinn obtain a loan from Island Federal Savings & Loan, to help him raise part of the amount he needed to contribute to the venture, and on February 16, 1966, Yee transmitted to Island Federal Savings, in Shinn's behalf, the latter's loan application forms and supporting documents for processing.

On April 20, 1966, Island Federal approved a loan to Shinn in the amount of $46,500, and Shinn signed a promissory note for that amount on that same date. As collateral for the loan, Shinn was required to pledge a parcel of land which he owned. An initial service charge of $4,650 was levied against Shinn on account of the loan, and this levy was included in the amount which Shinn had obligated himself to pay back to Island Federal. Shinn made his initial capital contribution of $2,500 to the joint venture on March 14, 1966. This represented one-half of the architects' fees then due and owing by Yee pursuant to his purchase agreement with Waikaha Manor. Yee conceded that this payment was a capital contribution by Shinn and was made pursuant to "some sort of agreement" entered into between them prior to March 14, 1966. On April 22, 1966, Shinn made another payment of $2,500. Both checks were made payable to the Kahala Towers project.

All of these transactions took place prior to April 26, 1966, obviously pursuant to an earlier agreement, and are supportive of the trial court's finding that a joint venture agreement came into existence on or before March 14, 1966. Moreover, Yee, while testifying that he did not believe that they had come to a complete agreement as early as March 14, 1966, nevertheless admitted that they had reached some sort of an oral agreement prior to that date. And later in his testimony he made the further statement that the oral agreement to which he referred was the same in all particulars as the proposed written agreement drawn by his attorney following a meeting of the parties held on April 26, 1966. On the important element of profit-sharing Yee testified that no change was made at the April 26 meeting. He stated that the formula he advocated at trial was the agreement and the arrangement he had with Shinn "from the very beginning."

It was for the trial court, and not for the parties themselves, to determine the legal effect of their conduct and discussions relative to the admittedly common undertaking, *Barnes v. Collins, 16 Haw. 340 (1904); cf. Black v. Lord,* 29 Haw. 204 (1926), *reh. den.* 29 Haw. 420, and the trial court

properly found that the parties had come to an agreement for a joint venture on or before March 14, 1966, and not on April 26, 1966, as urged by Yee at trial and on this appeal. The date, April 26, 1966, is significant only in the context of a collateral, though important, issue raised in this appeal. This particular matter will be discussed in Part III of this opinion.

It is apparent from the record that the real dispute between the parties concerned itself with three principal areas of their agreement: (1) division of the profits of the enterprise, (2) amount and nature of the capital contributions to be made by the parties and (3) ownership and use of the Bishop Estate lease. This last item will be discussed in Part II of this opinion.

With respect to the division of the profits, Shinn claims that he was entitled to 50% of the net. Yee, on the other hand, takes the position that 37½%, or one-half of 75%, was the maximum to which Shinn was entitled. What the parties agreed to as their respective shares of the profits of the common enterprise was a factual matter for the trial court to resolve and determine. *Collingwood v. Palmer*, 144 Kan. 636, 62 P.2d 910 (1936).

Shinn testified that the agreement he had with Yee called for a "50-50 split" of the profits of the joint venture. He admitted that early in the discussions, sometime in January, 1966, Yee had brought up the subject of paying certain officials of Island Federal Savings & Loan "under the table," for their help in arranging for the construction loan to the project. Shinn testified, however, that he was outraged by the suggestion, refused to go along with it, and told Yee he would have nothing further to do with the proposed joint venture. Shinn stated that Yee then told him: "Cool, cool. We'll drop the subject." Shinn testified: "I didn't want any money underneath the table. I went for 50-50 or none at all."

Yee, on the other hand, testified that he and Shinn had agreed from the very beginning that 25% of the profits would go to other parties, and that both would then share in the remaining 75% equally. He stated that he had told Shinn that it was to go to certain people helping with the project and with

the financing. He claimed that Shinn had agreed to that proposition. When asked on the witness stand who these people were, Yee explained that they were his two brothers, Clarence and Harry, and his business associate, Harry Otsuji, who was then president of Condominium Hawaii, Inc., the firm the joint venture eventually retained to develop and market the Kahala Towers units for a specified fee. Yee denied ever telling Shinn or anyone that 25% of the profits would go to any official of Island Federal Savings & Loan. For that matter, he claimed that he never did tell Shinn to whom that particular share of the profits would be paid.

It was for the trial court to assess the testimony of the witnesses, to consider their conduct relative to the joint venture, and to weigh their testimony in the light of all of the other evidence. It was for the trial court to determine, for example, whether Shinn was indeed willing, as asserted by Yee, to agree to a 25% reduction in his personal share of the profits, while being required to make equal contributions towards the capital requirements of the project, and without being told to whom and for what specific purpose a percentage of the total joint venture profits were to be paid to unnamed third parties. Moreover, the profits of a common undertaking belong to the joint venture, and in the absence of evidence to the contrary, the law will imply an equal division without regard to any inequality of contribution. *Smaller v. Leach*, 136 Colo. 297, 316 P.2d 1030 (1957), *cert. denied* 356 U.S. 936; *Hamilton v. Young*, 285 F. 223 (5th Cir. 1922); *Collingwood v. Palmer, supra. Cf.* HRS § 425-118. The finding by the trial court that an equal division of the profits was contemplated and intended by the parties was not clearly erroneous. *Cf. Collingwood v. Palmer, supra.*

In the area of capital contributions, Shinn testified that Yee told him that $206,000 was the anticipated amount required for the joint venture. Yee told him that he had already arranged for the basic and interim financing for the project with Island Federal Savings & Loan. Shinn testified that Yee told him that his share would be one-half of $206,000, or $103,000, and that he would not have to contribute any more

than that amount, except for a possible additional contribution of several thousand dollars for publicity connected with the project's model apartment. The record shows, as a matter of fact, that Shinn had contributed the sum of $107,000 to the venture by the time the relationship between the parties had become seriously strained.

The trial court found, however, that the agreement provided for equal contribution by the parties towards the expenses of the project. A joint venture is based upon a contractual relationship and while the parties may properly provide that the contributions of the parties need not be equal, *James v. Herbert; supra,* the court's finding was supported by the testimony of Yee to the effect that Shinn had agreed to bear one-half of the expenses of the project.

Directly related to the question of capital contributions was the finding of the trial court that Shinn was required under their agreement to contribute the additional sum of $121,000 towards the capital requirements of the project. This sum was the amount Shinn had originally calculated to be his share, as a stockholder, in the equity of Waikaha Manor, Inc., following the purchase by Yee of Waikaha's Kahala Towers developmental rights. Yee testified that at their meeting in January, 1966, when the parties were going over the initial requirements of the project, he had suggested to Shinn that if Shinn could arrange for Waikaha Manor to reduce the purchase price of $550,000 by the amount which Shinn would be entitled to receive from the corporation, there would be that much less for the joint venture to pay. Shinn did not deny that he had agreed to this arrangement, but he took the position that it was to be only a "deferred money" contribution. He testified that while his equity in Waikaha Manor was to be used as an offset against the purchase price of the Waikaha Manor project, it was understood and agreed that the money was going to be returned to him after 80% of the condominium units had been sold or after the project had been completed. Yee, however, took the position, and he so testified, that the sum of $121,000 was for his "know-how" and for his management of the joint enterprise. Yee having

also testified that the terms of the agreement which he urged upon the trial court were the arrangements he had with Shinn from the very beginning, the trial court apparently chose to accept Yee's version of this particular arrangement, and Shinn, against whom the adverse ruling was directed, has not raised the issue in his cross-appeal.

As with a partnership, there are two essential elements to a joint venture — a contract between the parties and a provision in the agreement for the sharing of the profits of the enterprise. *Cf. Winkelbach v. Honolulu Amusement Co., supra.* The evidence is clear that the parties did enter into a joint venture agreement for the development and sale of the Kahala Towers, and the court properly found that the contract came into existence on or before March 14, 1966, when Shinn made his initial capital contribution to the joint venture. The evidence is also clear that there was a provision in the agreement for the division of the profits. Only the ratio of distribution was in dispute. This was for the trial court to resolve, and its findings in this regard were not clearly erroneous. Obviously, the mere fact that the parties have taken contradictory positions on the witness stand, regarding the terms of their agreement, does not necessarily require a finding that no agreement was reached. *Cf. Collingwood v. Palmer, supra.*

II

Yee, who held title to the Bishop Estate lease, has taken the position that the lease was never an asset of the joint venture. The trial court held otherwise and entered the following findings of fact:

In or about March or April of 1966, the joint venture agreed to and did purchase from Yee said Bishop Estate Lease No. 11,832 and the plans and specifications for an apartment building which Yee had theretofore purchased from Waikaha Manor, Inc., and as and for the price therefor, the joint venture agreed to assume and pay to Waikaha Manor, Inc. the abovementioned $550,000.00 purchase price therefor and assume the obligations to

pay the delinquent rent and real property taxes and architectural fees abovementioned.

On or about June 1, 1966, Bishop Estate Lease No. 11832 was cancelled and a new Lease being Bishop Estate Lease No. 16,250 was made to and taken under the name of Yee, in place of Lease No. 11832 so cancelled.

On or about September 22, 1966, the joint venture made and delivered to Condominium Hawaii, Inc., [the firm retained to develop and market the project for a specified fee], a Sublease of the leasehold premises; the excess of the Sublease rent over the rent reserved in Bishop Estate Lease No. 16,250 ("Over-ride") being about $51,811.00 per year for the first 15-year period, $53,168.00 per year for the next 10-year period, $63,801.00 per year for the next 5-year period, and 20% of the renegotiated rent under the terms of said Lease No. 16,250 for the next 25-year period.

Said Bishop Estate Lease No. 16,250, the Sublease dated September 22, 1966 to Condominium Hawaii, Inc. and all right, title and interest of Yee and/or Condominium Hawaii, Inc. in all assignments of portions of said Sublease are and were at all times mentioned herein assets and property belonging to the joint venture.

In short, the trial court held that the sublease "over-ride" was property belonging to the joint venture. The foregoing findings were supported by substantial evidence and are not clearly erroneous. Without the lease there could have been no project. The joint venture agreement would have been impossible of performance. The essence of the purchase by Yee of the Waikaha Manor developmental rights as he readily admitted, was the acquisition of the Bishop Estate leasehold. And because the parties had agreed to a joint undertaking for the Kahala Towers project, as the court so found, it was reasonable, if not mandatory, for the trial court to further find that the lease was part and parcel of the joint venture. But there was more beyond this aspect of the case from which the trial court could properly reach its findings. Discussions concerning the joint venture were initiated by Yee shortly following

his purchase of the lease from Waikaha Manor. He testified that early in the negotiations with Shinn he had pointed out to him that if Shinn could get Waikaha Manor to reduce the purchase price of $550,000 by the amount of Shinn's equity as a stockholder in Waikaha Manor, there would be that much less for the joint venture to pay. Shinn testified that he had agreed to this arrangement and explained that both he and Yee, as partners, would then be paying Waikaha Manor the purchase price, less the sum of $121,000 which he had calculated his equity in Waikaha Manor to be. The payments to Waikaha Manor by the parties were to be made in installments required by the purchase agreement, the terms of which were similarly contained in the promissory note executed by Yee on March 7, 1966. The first such installment was not due until July 1, 1967, and the development of the project was scheduled to commence in 1966. The Master's Report shows that the purchase price of $550,000 was charged to the costs of construction on the books of the joint venture.

In addition to the purchase price of $550,000, Yee had agreed to assume certain of Waikaha Manor's existing obligations, which amounted to approximately $126,000. These items were included in Yee's initial estimate of the capital requirements of the project, one-half of which ($103,000) Shinn had agreed to contribute. Shinn did make the required contributions, and relative thereto Yee testified:

Q Well, what was the money being contributed by Dr. Shinn to be used for?

A It was used for the acquisition of the development rights and for the expenses incurred.

Q And what were the development rights? They were acquired from Waikaha Manor, Inc.; were they not?

A That's correct.

Q And you stated that included the Bishop Estate lease.

A That's right.

There was ample evidence from which the trial court could conclude that the parties intended the Bishop Estate

lease to be the property of the joint venture, and in so holding the court did not err. A formal assignment of the Bishop Estate lease to the joint venture was not required. *Cf. Moropoulos v. C.H. & O.B. Fuller Co.*, 186 Cal. 679, 200 P. 601 (1921); *Ah Leong v. Ah Leong,* 28 Haw. 581 (1925).

In *Moropoulos,* the court stated:

"Where one holding a lease of premises enters into a partnership with another, agreeing to the use and possession of the leased property in the business, a valid interest in the lease is thereby vested in the partnership." 186 Cal. at 688, 200 P. at 605.

III

Yee has raised in this court the applicability of the "unclean hands" doctrine. Earlier we made reference to the date, April 26, 1966, as having some significance to a collateral issue raised in this appeal. On that date, Shinn and Yee, with their respective attorneys, Genro Kashiwa and Harold Yamada, met to discuss the joint venture. Regarding this meeting, Mr. Kashiwa who was Shinn's attorney testified:

"The other thing was that up to then, the agreement was a 50-50 joint venture. Then at this meeting, they say it's 37½, and we discussed why it was 37½. And the reason was that Dr. Shinn was to get one half of 75 per cent of the profits, and I found out that the 25 per cent of the profits was supposed to go to the person who arranged to get the mortgage financing. There was a 6.8-million mortgage loan commitment, and the 25 per cent of the profit was supposed to go to that person who arranged for that mortgage loan. And, therefore, the only thing remaining to be split between the two partners was 75 per cent, and 37½ per cent is 50 per cent of 75 per cent.

"So I explained that to Dr. Shinn and said that if a person can get a 6.8-million dollars mortgage loan commitment, maybe he's entitled to 25 per cent of the profit. And we understood that this was not Edwin Yee or his brothers or anybody else, but we understood that to be Mr. Cliff Krueger of Island Federal.

"And I told Dr. Shinn, that, 'Well, as far as I'm concerned, it's a legitimate expense and, therefore, the only amount remaining would be 75 per cent each; that's 50-50'. And this is — I clarified this in my letter of September 1st.'"[2]

Yee, however, expressly denied on the witness stand the existence of any "kickback" arrangement with Krueger and further denied ever telling Shinn or anyone that 25% of the profits would go to any official of Island Federal Savings & Loan. He has nevertheless advanced the argument that because Shinn had agreed to an alleged illegal "kickback" arrangement, he should now be precluded from asserting his claims under the joint venture agreement. He seeks the invocation against Shinn of the equitable doctrine of "unclean hands," which holds that "[h]e, who comes into equity must come with clean hands."

This defense is raised for the first time on appeal. The fact, however, that it was not presented to the trial court does not preclude us from considering the matter. *Primeau v. Granfield,* 193 F. 911 (2nd Cir. 1911), *cert. denied* 225 U. S. 708 (1911); *Gaudiosi v. Mellon,* 269 F.2d 873 (3rd Cir. 1959), *cert. denied* 361 U.S. 902 (1959); *Gilmore v. Thomas,* 252 Mo. 147, 158 S.W. 577 (1913); *cf. Young v. Wo,* 36 Haw. 676 (1944). But whether the party against whom the maxim is sought to be applied engaged in iniquitous conduct is primarily a question of fact, and the issue having first been raised on appeal, we are called upon to make this determination. And on the factual posture of the case before us, we are not persuaded by Yee's argument. The doctrine is not one of absolutes, and each case must be judged on its particular facts and circumstances. *Keystone Driller Company v. General Excavator Company,* 290 U.S. 240 (1933).

---

[2] Such an expenditure would have been far from being legitimate. McConnell v. Commonwealth Pictures, 7 N.Y.2d 465, 166 N.E.2d 494, 199 N.Y.S.2d 483 (1960); *see* Fleishacker v. Blum, 109 F.2d 543 (9th Cir. 1940). In advising his client as he did, counsel was in error. Such advice was clearly not in the best interest of his client. Neither was it in keeping with the attorney's code of professional conduct. Were it not for the peculiar circumstances of this case, his advice could have been fatal to his client's cause.

It had been agreed by the parties that Yee was to be the managing partner in the joint venture, and that he was "going to run the show." He was responsible for securing the necessary construction financing for the project. Shinn had no direct connection or communication with Krueger or with any other official or employee of Island Federal Savings & Loan regarding the construction loan made to the joint venture. Shinn and Kashiwa testified that *Yee told them* that the joint venture had to pay Krueger 25% of the profits for his help in arranging for the loan to the joint venture. In fact there was no such agreement with Krueger. Shinn agreed on the basis of the *representation by Yee* that the joint venture had obligated itself to pay Krueger. Yee, however, denies that he ever made that representation. He denies that he ever discussed with Shinn, much less agreed to, any alleged "kickback" arrangement with Krueger. He denies that there was ever such an arrangement, and in fact there was none.[3] Instead the record shows that unknown to Shinn, Yee had intended that 25% of the profits should go to Yee's two brothers and to a close business associate. Assuming that Yee did make the alleged representation to Shinn and Kashiwa, no conclusion can be drawn other than that it was made by Yee in pursuance of this undisclosed objective. If any iniquitous conduct is chargeable to a party in this situation it must be charged to Yee and not to Shinn. Yee cannot have his cake and eat it, too. The doctrine of "unclean hands" will not allow a party to profit by his own misconduct. The concept is based upon "considerations that make for the advancement of right and justice," *Keystone Driller Company v. General Excavator Company, supra,* at 245, and will not be invoked when to do so would work injustice and wrong. *Jones v. Jones,* 30 Haw. 565 (1928). Shinn's misconduct, if at all, was purely in the abstract and in the circumstances of this case did not constitute

---

[3] Yee's attorney himself represented to the trial court:

MR. ROTHER: Krueger denied it. We do not intend that he [Krueger] is to get one-fourth, he is not vested with one-fourth in the accounting. he didn't get one-fourth, it's just a contention by the plaintiffs [Shinn] that he was to get one-fourth, he [Krueger] himself denied it, the defendants [Yee] denied it.

unclean hands. *Republic Molding Corporation v. B . W . Photo Utilities,* 319 F.2d 347 (9th Cir. 1963).

But there are also other compelling reasons why Yee's assertions of "unclean hands" should be dismissed for lack of merit. Shinn allegedly agreed to the illegal "kickback" arrangement to pay Krueger at the meeting of April 26, 1966. The record shows, however, that Island Federal Savings & Loan, through one of its officers (not Krueger), had already given its construction loan commitment of $6.8 million *before* the April 26 meeting. There is absolutely no evidence to show that this commitment was illegally obtained. Everything in the record points to the contrary. This loan assurance to the joint venture was made on March 21, 1966, a week after the oral agreement of March 14, 1966. It is clear, therefore, that there was absolutely no connection between the alleged illegal agreement to pay Krueger and the loan itself. No impropriety on the part of Shinn, relative to the loan commitment of March 21, 1966, has been shown. And where the plaintiff's claim has no direct connection with the alleged misconduct, and is supported by independent consideration, the doctrine of "unclean hands" will not be invoked to defeat his claim. *Jones v. Jones, supra; Woodward v. Auyong,* 33 Haw. 810 (1936); *Kuwahara v. Kuwahara,* 23 Haw. 273, 276 (1916). In *Kuwahara,* we said:

"An obligation will be enforced, . . . if it is supported by an independent consideration, *so that the plaintiff does not require the aid of the illegal transaction to make out his case."* (Emphasis added)

Moreover, the trial court found. and we agree, that the joint venture agreement of the parties came into existence on or before March 14, 1966. It further found that the April 26 meeting was designed to amend or modify the original agreement of March 14, 1966, but that the parties had failed to agree to the essentials of the proposed amendatory agreement. This particular finding was not clearly erroneous. But even if we were to assume that an agreement to modify the original contract was reached at that meeting, yet, following Yee's reasoning on appeal, the amendatory agreement would

have been so permeated with the illegality of the "kickback" provision that it would have been void and unenforceable. *Cf. Goo Yee v. Rosenberg*, 21 Haw. 513 (1913). In that event, obviously, the amendatory agreement could have no effect and the original contract must stand. *Tillman v. Talbert*, 244 N.C. 270, 93 S.E.2d 101 (1956); *cf. Spellman v. Ruhde*, 28 Wis.2d 599, 137 N.W.2d 425 (1965).

We have considered Yee's other specifications of error. They are either without merit, or the errors of which he complains were harmless. In the absence of a clear showing to the contrary, it will be presumed that the trial judge relied only on evidence properly admissible in making his determinations. *United States v. 396 Corp.*, 264 F.2d 704 (2nd Cir. 1959), *cert. denied* 361 U.S. 817 (1959). Substantial competent evidence in the record supports the trial court's findings on the essential factual issues under consideration.

## IV

Shinn in his cross-appeal alleges that the trial court erred in denying his request for a tracing of the joint venture funds misappropriated by Yee for his own use and benefit.

The trial court found that Yee, without the knowledge and consent of Shinn, borrowed $400,000.00 on August 22, 1966, and another $225,000.00 on September 14, 1966, from Island Federal Savings & Loan on the security of a mortgage of the Bishop Estate lease, using a portion of the loan proceeds to pay joint venture expenses and the remainder for his own separate businesses. The court then concluded as follows:

That the proceeds of the loans made by Yee on August 22, 1966 in the sum of $400,000.00 and on September 14, 1966 in the sum of $225,000.00 from Island Federal Savings & Loan Association on the security of a mortgage of said Bishop Estate Lease No. 16,250 are funds belonging to the joint venture and the use by Yee of a portion of said proceeds in its own business and the business of its subsidiaries or affiliated companies, other than for the purpose of the joint venture is a misappropriation thereof

and was wrongful, unlawful and in breach of its fiduciary duties and the terms of the joint venture;

That Yee must account to the joint venture and Shinn, the disposition and use by Yee of any and all amounts, funds and assets of the joint venture for its own business, use or advantage or for purposes other than the joint venture purposes as abovementioned.

The relief granted Shinn by the trial court for Yee's appropriation of part of the funds for other than joint venture purposes was the requirement that Yee repay the amounts borrowed and pay interest on the funds so used. Shinn does not claim that profits were made, but he would have this court decree that the funds borrowed be traced to determine whether profits were made by Yee as a result of these transactions. See *Watumull v. Ettinger,* 39 Haw. 185 (1952); *Peine v. Murphy,* 46 Haw. 233, 377 P.2d 708 (1962); 5 Scott on Trusts, 3rd Ed., § 503.

Strictly speaking, there was a misuse of joint venture funds. No fraud or fraudulent intent on the part of Yee, however, has been shown, and on the basis of the record the trial court properly found none. Yee was the owner of a number of other companies subsidiary to, or affiliated with, Edwin Yee, Ltd. He testified that it was common business practice for him to transfer funds between companies as the need arose. By agreement with Shinn, he was in complete charge of joint venture operations. The record shows that loans from and to the joint venture were made throughout the period under consideration. The Master's Report for the period ending June 5, 1970, showed loans to thirteen affiliates amounting to $383,000. At that same point in time, the joint venture owed certain other affiliates the total sum of $343,000. An updated report covering the subsequent period ending October 31. 1971, showed loans to the joint venture from the affiliates amounting to $355,000. This was adjusted upward to $461,000 by order of the court. Loans to the joint venture as of that date totalled $552,000. Throughout the entire period interest was uniformly assessed against each of these loans, except that as to certain loans from the joint

venture interest rates were increased by order of the trial court. At the time of the hearing on the Master's reports, on January 26, 1973, prior to the entry of judgment, the aggregate of the loans to the joint venture was still greater than the amount of its loans to the affiliates. Except where the original Holiday Mart loan of $225,000 from the joint venture was concerned, the record does not disclose the specific purposes for which these various loans to and from the joint venture were made. Presumably, as in the case of Holiday Mart, they were designed to meet operational requirements.

Shinn's remedy in this case was addressed to the sound discretion of the trial court. *Virginian Ry. v. Federation*, 300 U.S. 515, 550 (1937). The relief granted in equity is dictated by the equitable requirements of the situation, and must be adapted to the facts and circumstances of the particular case. *Fleming v. Napili Kai, Ltd.*, 50 Haw. 66, 430 P.2d 316 (1967), reh. den. 50 Haw. 83, 431 P.2d 299. Following a review of the entire record, we are disinclined to hold that the trial court abused its discretion in molding its decree so as to satisfy the requirements of this particular case.

Affirmed.

*Murray Estes (Robert Hogan, of counsel) for defendants-appellants, cross appellees.*

*Douglas S. Hasegawa (Kashiwa & Kanazawa, of counsel) for plaintiffs-appellees, cross appellants.*

DISSENTING OPINION OF LEWIS, J.

Being of the opinion that the record is such that the judgment cannot be affirmed, I respectfully dissent. The principal points are reviewed under four headings.

1. *The $121,000 matter; no agreement was reached on or before March 14, 1966*

When the court found that as a term of the joint venture between the parties: "The sum of $121,000 [being] the value of Yee's managerial ability and 'know-how' . . . shall be cred-

ited to Yee in the accounting", this precluded the conclusion that the parties reached an agreement on or before March 14, 1966, because the quoted finding rests on testimony as to what happened at and after the meeting of April 26, 1966.

Shinn's attorney, Genro Kashiwa, testified that prior to the April 26, 1966 meeting it had been his understanding that Shinn would put up the "so-called $121,000" but "get it back after the condominium units were sold." At the April meeting with Yee and his attorney "they said that he was not to get that back and that was to match Edwin Yee's know-how . . . ." He advised his client to go along with that "and Dr. Shinn finally agreed to that."

While Kashiwa was not present at Shinn's meetings with Yee prior to April 26, 1966, his understanding of the previous negotiations is borne out by his client's testimony. Shinn was asked as to his stock in Waikaha Manor:

Q. . . . You had approximately . . . I believe your testimony is . . . $121,000 in there. Now, when were you to get that $121,000 pursuant to the agreement that you had with Mr. Yee?

He answered:

A. It was a deferred money. I wasn't giving anything away. . . .

. . . . . .

Q. It was clearly your understanding that you would get back the money?

A. Absolutely.

On cross-examination, he testified:

Q. . . . I'm merely asking you, did you agree to pay to Edwin Yee, Limited $121,000 . . . .

A. Not $121,000 paying to Edwin Yee but deferred payment. . . . In paying Waikaha Manor Corporation, only Mr. Yee and I both jointly will pay that proportion amount of $121,000 less. But that amount, total amount, will be returned to me after 80 per cent of the apartments are sold — this is out of Mr. Yee's own mouth — or the

Waikaha Manor condominium building is up, which came first.

The court rejected this contention, and as noted in the majority opinion we do not have it before us for review. The issue here is whether the agreement that Yee was to receive $121,000 for his managerial ability and know-how was reached during the period designated by the court in its findings, herein referred to as "the earlier period." Yee testified that there was some sort of agreement prior to March 14, 1966, but "I don't think by that time we could have agreed to a complete oral understanding that early." The following is all that can be found in Yee's testimony touching on the $121,000 matter during the earlier period:

"... I was suggesting to Dr. Shinn way back in January that if he were able to get Waikaha Manor, Inc., to reduce the $550,000 by the purported amount that was due him, it would therefore mean that we would have, if we went into a venture, that much less to pay."

This was at a time when the parties were reviewing the amount of money that would have to be raised.

The court did not find that agreement was reached to seek this reduction in the amount to be paid Waikaha Manor, Inc. If a reduction had been achieved, the amount involved would have been variable, dependent on the actual value of Shinn's Waikaha Manor holdings,[1] a position Shinn took unsuccessfully.[2] The court erred in finding that the parties had completed their negotiations on this point by March 14, 1966. These negotiations concerned the amount Shinn was to contribute, an essential term of the joint venture as the major-

---

[1] Shinn testified that he received only $90,000 from Waikaha Manor, Inc., for his holdings.

[2] According to Yee, Shinn did not take this position until after the April 26, 1966 meeting:

Q. And on April 26, or at any time before that, did Dr. Shinn ever ask you to take less than $121,000?

A. No, he didn't.

ity opinion recognizes. While I am of the opinion that there were other essential terms on which the parties had not agreed by March 14, 1966, this suffices to show that no contract was made on or before that date.[3]

It is fundamental that "there must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract." *Honolulu Rapid Transit Company, Ltd. v. Paschoal*, 51 Haw. 19, 27, 449 P.2d 123, 127 (1968), followed in *Carson v. Saito*, 53 Haw. 178, 182, 489 P.2d 636, 638 (1971), and *Earl M. Jorgensen Co. v. Mark Construction, Inc.*, 56 Haw. 466, 540 P.2d 978 (1975). "Only a contract with no material or essential terms to be settled can be enforced in a court of equity. It must have been completely determined between the parties and its terms definitely ascertainable without resort to future negotiations." *Molokai Ranch, Ltd. v. Morris*, 36 Haw. 219, 227 (1942); *Francone v. McClay*, 41 Haw. 72, 78 (1955). "A court of equity cannot make a contract . . . ." *Vierra v. Ropert*, 10 Haw. 294, 300 (1896).

### 2. *Negotiations on and after April 26, 1966; should this court modify the judgment?*

The next question is whether the agreement found by the court ultimately was reached by the parties, even though it was not complete as early as March 14, 1966. This question is answered by the court's findings that the negotiations on and after April 26, 1966 concerned a "proposed amendment." The court thus recognized that the later negotiations deviated from the terms which the court had found comprised the agreement. Of course, if any term of the agreement still was under negotiation — and at least one was — all were open to negotiation when the parties met with their attorneys on April 26, 1966. On the record, the most that plaintiffs can hope for is modification of the judgment.

---

[3] It is noteworthy that prior to the April 26, 1966 meeting only $2500 was paid in as capital contributions by Shinn, plus another $2500 on April 22, 1966 which was withdrawn six days later.

Modification of the judgment would be possible only if this court could determine without additional findings that an agreement was reached as a result of the negotiations that occurred on and after April 26, 1966, and the terms of that agreement. I am of the opinion that no such disposition of the case is possible.

The record is clear up to a point. It shows that when the parties met with their attorneys on April 26, 1966, they worked out a new formula whereby Shinn could at any time fail or refuse to advance further capital without being excluded altogether from sharing in the profits; fixed Shinn's share in the profits at 37½% if he made all required payments instead of the 50% found by the court; and went into a number of other matters, with the result, according to the testimony of Yee and his attorney, Harold Yamada, that an oral agreement was reached. Yamada was instructed to draft the agreement. He presented his draft on July 12, 1966. Yee testified that this draft (herein referred to as Exhibit 3) contained "[m]y oral agreement with Dr. Shinn." However, plaintiffs' attorney, Mr. Kashiwa, also presented a draft. He testified that Exhibit 3 was his understanding of the agreement that had been reached by the parties prior thereto "except that there was some areas which I thought needed clarification, and, therefore, I wrote the letter of September 1st" (herein referred to as Exhibit 4). Exhibit 3 "did generally reflect what was agreed on at the April 26 meeting," he testified, and further testified that "the two agreements [Exhibits 3 and 4] taken as a whole are acceptable to [Dr. Shinn]." He had Dr. Shinn sign them, though they were not delivered. The parties never did execute a written agreement.

I am of the opinion that if the parties reached an oral agreement on all essential points at the meeting of April 26, 1966, the execution of a written contract was not a condition precedent to the taking effect of that agreement. See Williston on Contracts, §§ 28 and 28A (3d ed.); *Restatement of the Law of Contracts*, § 26; *General Realty Corporation v. Douglas Lowell, Inc.*, 223 Or. 244, 354 P.2d 306 (1960); Annotations, 122 A.L.R. 1217, 165 A.L.R. 756. However, this being

an action for specific performance in which a constructive trust of the assets held in Yee's name is sought, the evidence of the parol agreement must be clear, definite, and unequivocal. *Poka v. Holi*, 44 Haw. 464, 472, 357 P.2d 100, 106 (1960), *rehearing denied*, 44 Haw. 582, 358 P.2d 53; *Kuwahara v. Kuwahara*, 23 Haw. 273, 276 (1916); *Ables v. Ables*, 39 Haw. 598, 601 (1952); *Kam Oi Lee v. King Fong Wong*, 57 Haw.    ,    P.2d    (1976). This imposes a heavy burden on plaintiffs.

Exhibit 4 when compared with Exhibit 3 raises questions as to whether the parties did, at the April 1966 meeting, agree on all essential points leaving only arguments as to phraseology. Moreover, there is conflicting evidence on important points and the credibility of that evidence has not been determined. These are questions for the trial court to resolve, as further developed below.

### 3. *The sublease override; whose testimony should be believed?*

One area in which there is conflicting evidence concerns the sublease rent, which was in excess of the rent reserved in the Bishop Estate lease. Plaintiffs were awarded a share in this override. However, the court did not take into account the negotiations after March 14, 1966. It found these negotiations looked only to a "proposed amendment" and did not culminate in any agreement, but made no findings as to the particulars of the "proposed amendment." In fact, no agreement had been reached by the March date, and the negotiations on and after April 26, 1966 were part of the main negotiations. Exclusion from consideration by the court of the evidence as to what occurred in the later negotiations was error and invalidated the court's findings. *Rowe v. General Motors Corporation*, 457 F.2d 348, 356, note 15 (5th Cir. 1972); *Ritter v. Morton*, 513 F.2d 942, 949 (9th Cir. 1975); *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1042 (5th Cir. 1969).

Yee and Yamada testified that Shinn and Kashiwa were told about the sublease at the April 26, 1966 meeting, and also were informed that Shinn was not to participate in it, to which Kashiwa, Shinn's attorney, agreed. The discussion specifically included the override, according to this evidence. The following is from Yee's testimony:

Q. At any time, did you tell Dr. Shinn or Mr. Kashiwa of these override provisions?

A. That is called a sandwich rent position. On the first meeting on April 26 when Dr. Shinn, Mr. Kashiwa, Harold Yamada, and I were present, I think Genro Kashiwa asked me whether there was a sublease, and I indicated there was, and whether there was a sandwich rent provision, and I said there was. Then he says, "Is this involved in this development together with Dr. Shinn?" And I said, "No, this is not involved. This sublease and sandwich rent is not included. The only part that Dr. Shinn has a portion of would be that part where the profit would be from the sales of the apartment units." This is in the presence of these other three men.

. . . . . .

A. May I answer further on the first question. These three other men were there, and this is why in the initial draft of the Yamada agreement and subsequently the Kashiwa addendum no mention was made of the sandwich rent provision.

Q. There is no mention of the sandwich rent in the Yamada agreement or in the Kashiwa amendment.

A. That's correct. And that's because of the agreement made at that time. Certainly, if there were such an agreement, both of these documents would so indicate this.

Shinn and Kashiwa denied knowledge of the override. If this is believed it would explain why Exhibit 4 did not take issue with the description in Exhibit 3 of the profits in which Shinn was to share, namely "the profits received by Yee from

Condominium Hawaii, Inc., from the sale of the apartment units in the project." It would clear the way for reliance on a constructive trust in all joint venture assets held in Yee's name. On the other hand, if Yee and Yamada are to be believed, the most that Shinn could receive would be a share in the profits from the sale of the apartments. This court cannot resolve the question.

### 4. *The 25% matter; whose testimony should be believed?*

As has been stated, Shinn's share in the profits was fixed at 37½% at the April 26, 1966 meeting.[4] At this April meeting the parties were in agreement that there was only 75% to be divided, but there was a conflict in the evidence as to why this was so. On one view of the evidence the clean hands maxim was applicable. This matter was not pursued in the trial court, as the defendants did not raise it there nor did the court raise it of its own motion. A direction for determination of the applicability of the clean hands maxim should be included in the remand for further fact determination which in my judgment must issue.

Dr. Shinn testified that "all through the year of 1966 was the most difficult year in the history of the United States . . . that means Hawaii, too, . . . to raise mortgage money." Yee assured him at one of their early meetings that he had both interim financing and take-out money for the project from Island Federal Savings and Loan Association. During a conversation in the month of January 1966, Shinn testified, Yee told him that it had been arranged with Cliff Krueger, the president of Island Federal, that "25 per cent interest in the building will be given away underneath the table." According

---

[4] On review of the evidence as to what happened prior to the April 26, 1966 meeting, the court's finding that Shinn's share was 50% is supported only by Shinn's testimony that he refused to take less. Since Yee throughout took the position that there was only 75% to be divided between the parties this leads to the conclusion that no agreement was reached on Shinn's percentage during the earlier period. However this may be, the percentage Shinn was to receive was open for negotiation at the April meeting, no complete agreement having been arrived at up to that time.

to Shinn's testimony, he hotly refused to go along with the arrangement, telling Yee: "Just forget about it. I don't want to be [a] partner. I don't want any money to go underneath the table." Yee's reply, according to Shinn, was "Cool, cool. We'll drop the subject." Shinn further testified he never heard about the 25% again until the later negotiations, which as noted above commenced April 26, 1966. "I went for 50-50 or none at all . . . ."

Yee testified he never said that 25% of the profits was to go to Cliff Krueger, and never made such an arrangement. According to Yee, from the very beginning his arrangement with Shinn was that 75% of the profits would be shared between them. "I said to Dr. Shinn that the 25% is committed to people who are helping in the project and helping in the financing," and Dr. Shinn said "okay." Yee "never told Dr. Shinn to whom I was going to give the 25 percent," just "someone else" for "help with the sales and financing." What he had in mind, he testified, was division of this 25% among associates and relatives who regularly helped him with his projects. He explained the practice of having nominees who act as apartment buyers, saying this was the kind of help in securing financing he had in mind.

Cliff Krueger, called as a witness at the first trial,[5] testified on October 30, 1969 that he made no arrangements for a 25% kickback for arranging financing for Kahala Towers. He was not a witness at the second trial.[6] Upon argument in this court, we were assured that no kickback was paid. The trial court made a similar inquiry and received the same answer.

Shinn would not admit that he ultimately agreed to the 25% payment even though his memory was refreshed by calling to his attention his testimony at the first trial. The evidence that he did so agree consists in his signature on

---

[5] This case first was tried in 1969, and preliminary findings of fact and conclusions of law were entered. Upon the death of the presiding judge, a new trial was ordered. The appeal is from the judgment rendered upon the second trial.

[6] Some time before 1972, Krueger pleaded guilty to a charge of giving false information to the Federal Home Loan Bank Board and was sentenced to two years' imprisonment. See United States v. Krueger, 454 F.2d 1154 (9th Cir. 1972).

Exhibit 4, the pertinent provisions of which are reviewed below, and the testimony of his attorney, Genro Kashiwa, who on April 26, 1966 was present at the negotiations for the first time. Kashiwa testified he had never heard of this 25% matter before. It was one of two things that were "really different" from what Shinn had told him. Instead of a 50-50 joint venture, "at this meeting they say it's 37½, and we discussed why it was 37½." The testimony continues: "And the reason was that Dr. Shinn was to get one half of 75 per cent of the profits, and I found out that the 25 per cent of the profits was supposed to go to the person who arranged to get the mortgage financing . . . a 6.8 million mortgage loan commitment . . . . And, therefore, the only thing remaining to be split between the two partners was 75 per cent, and 37½ per cent is 50 per cent of 75 per cent." He further testified as to the person who would receive the 25%: "And we understood that this was not Edwin Yee or his brothers or anybody else, but we understood that to be Mr. Cliff Krueger of Island Federal."

Kashiwa advised Shinn to go along with this plan, and testified that Shinn ultimately agreed "on the understanding that the 25 per cent would go to Cliff Krueger or somebody else for obtaining the mortgage loan commitment. And it was made — And that's what I clarified in my letter. . . ," referring to Paragraph 5 of Exhibit 4 which read:

> 5. It is understood that 25% of profits has been committed to third party or parties other than Edwin Yee, Ltd. or any other corporation that Edwin Yee or his relative and associates are connected with or have any interest in, as consideration for obtaining financing for the project; that the total profit to Shinn and Yee shall not in any event be less than 75% of the profits of the project; and that Edwin Yee's profits and advantages shall not in any way, directly or indirectly exceed 37½%.

Kashiwa's testimony continued:

> Q. . . . Now, nowhere in this provision does it state that this 25 per cent is going to Mr. Cliff Krueger, does it?
> A. No, it doesn't state that. . . .

· · · · ·

A. I didn't think it was appropriate to use his name.
Q. You were informed that this was to go to Mr. Krueger?
A. Yes.
Q. Specifically Mr. Krueger?
A. Yes.

Exhibit 3 had contained nothing as to the disposition of the 25%, merely showing that there was 75% to be divided between the parties. On its face, this gave considerable leeway to Yee, the managing partner, as to the disposition of the remaining 25%, and if this truly represented what was agreed at the April 26, 1966 meeting and Yee's other testimony were believed, no question of clean hands was involved.

On the other hand, if Shinn's and Kashiwa's testimony were believed and paragraph 5 of Exhibit 4 more nearly represented what was agreed at the April 26, 1966 meeting, the real intent being that 25% of the profits should be paid to the president of Island Federal as a reward for the loan commitment, Shinn would be out of court under the clean hands maxim.

"Illegality, if of a serious nature, need not be pleaded. If it appears in evidence the court of its own motion will deny relief to the plaintiff. The defendant cannot waive the defense if he wishes to do so. Indeed, if the court suspects illegality, it may examine witnesses and develop facts not brought out by the parties, and thereby establish illegality that precludes recovery by the plaintiff. . . . " *Restatement of Contracts* § 600, Comment a; *Sinnar v. Le Roy,* 44 Wash.2d 728, 270 P.2d 800 (1954). If the issue of illegality has not been pursued in the trial court, the appellate court may itself raise the issue and remand for findings on the point, *Waring v. Lobdell,* 63 Wash. 2d 532, 387 P.2d 979[7] (1964), or if further findings are

---

[7] Some courts have said that for the issue of illegality or unclean hands to be raised for the first time in the appellate court there should be no shadow of doubt. *Mosley v. Magnolia Petroleum Co.,* 45 N.M. 230, 114 P.2d 740 (1941); *Radley v. Smith,* 6 Utah 2d 314, 319, 313 P.2d 465, 468 (1957). But since a remand in any event is called for in the present case because of errors of the trial court, the question whether a remand would be ordered solely on the issue of clean hands when not urged in the trial court, is not presented.

not necessary, the appellate court may order the case dismissed though the issue of illegality was not raised in the trial court. *Gaudiosi v. Mellon,* 269 F.2d 873 (3d Cir. 1959); *Primeau v. Granfield,* 193 F.911 (2d Cir. 1911); *Armstrong v. Gresham,* 73 Colo. 13, 213 P. 114 (1923). Quoting from *Gaudiosi v. Mellon, supra;*

"Courts are concerned primarily with their own integrity in the application of the clean hands maxim and even though not raised by the parties the court will of its own motion apply it." (p. 881)

This court has said:

"The application of the maxim of 'clean hands' is not in protection or vindication of rights of parties but a salutary guide of the conscience of the chancellor. The right to apply the maxim does not depend upon the state of the pleadings. It is inherent in the court." *Young v. Wo,* 36 Haw. 676, 685 (1944).

As stated by Lord Mansfield in the much quoted case of *Holman v. Johnson,* 1 Cowper 341, 343, 98 Eng. Rep. 1120, 1121 (1775):

"The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may say so. . . ."

That a plaintiff is able to make a good case for relief without alleging or proving the illegality will not save his case when the evidence shows a hidden corrupt purpose. *Sinnar v. Le Roy, supra,* 44 Wash. 2d 728, 270 P.2d 800 (1954); Corbin on *Contracts,* Vol. 6A, §§ 1460, 1533. The court will act in accordance with the realities of the situation, not confining itself to technicalities as to the exact provisions of the contract between the parties but instead taking into account any

resultant fraud upon third parties. *Baccioces v. Transamerica Corp.*, 2 Cal. App. 2d 595; 38 P.2d 417, 418 (1934); *Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838 (2d Cir. 1952).

Here, if the testimony of Shinn and Kashiwa is believed, Shinn, practically from the beginning of the negotiations, understood that the vital construction loan for the project had been obtained by commercial bribery.[8] Whether or not in violation of the penal law of the state, commercial bribery is regarded as being of a heinous character. *McConnell v. Commonwealth Pictures*, 7 N.Y.2d 465, 166 N.E.2d 494, 199 N.Y.S.2d 483, 487 (1960), followed in *Colyvas v. Red Hand Compositions Co.*, 318 F.Supp. 1376 (S.D.N.Y. 1970). If a bank official receives a bonus for making a loan, it is a fraud upon the stockholders. *Fleishacker v. Blum*, 109 F.2d 543 (9th Cir. 1940).

When Shinn, according to Kashiwa's testimony, agreed that Krueger should be paid 25% of the profits, he did so knowing that the front money for which he was committing himself would bring to fruition the loan which he had been informed was illegally obtained. He understood also that if all went as hoped this would culminate in the payoff from profits to which he had agreed, with 37½% of the profits going to himself. The exact date of the loan commitment has no bearing. One who acquires rights in the fruits of a wrong already committed cannot excuse himself on that ground when he has acted affirmatively to magnify and increase its effects. *Precision Instrument Manufacturing Co. v. Automatic Maintenance Machinery Co.*, 324 U.S. 806, 819 (1945).

Nor does it matter that it was Yee who obtained the loan. Even if Shinn had no wrongful purpose of his own, "he can maintain no action for breach if he does any act in furtherance of the other party's wrongful purpose." Corbin on *Contracts*, vol. 6A, § 1518, p. 747; *Restatement of the Law of Contracts*, vol. II, § 602(2); *Sherwood & Roberts-Yakima, Inc. v. Leach*, 67 Wash. 2d 630, 409 P.2d 160 (1965); *Paul Jones & Co. v.*

---

[8] Commercial bribery is a crime under the Hawaii Penal Code enacted by Act 9. S.L. 1972, HRS § 708-880, although in 1966 it was not.

*Wilkins*, 185 S.W. 1074 (Tenn. 1916); *Aiken v. Blaisdell*, 41 Vt. 655, 668 (1869).

Though the actions of the defendant, as depicted by Shinn and Kashiwa, were more reprehensible than those of plaintiff, this is immaterial when public policy requires the assertion of the clean hands maxim because of the seriousness of the illegality involved. *Precision Instrument Manufacturing Co. v. Automatic Maintenance Machinery Co., supra*, 324 U.S. 806, 814 (1945). "In respect to offenses in which is involved any moral delinquency or turpitude, all parties are deemed equally guilty, and courts will not inquire into their relative guilt." *Lowell v. The Boston and Lowell Rail Road Corp.*, 40 Mass. (23 Pick.) 24, 32 (1839).

Nor is plaintiff in the clear just because defendant denies that any wrong occurred. *Young v. Wo, supra*, 36 Haw. 676, 681 (1944). And the result would not be affected though the court found that no kickback ever was promised Krueger, if Shinn and Kashiwa understood that it was and agreed that 25% of the profits should be reserved for that purpose. *Kuehnert v. Texstar Corporation*, 412 F.2d 700, 703-704 (5th Cir. 1969); *Bishop v. Bishop*, 257 F.2d 495, 501 (3d Cir. 1958). Furthermore, the fact that the immoral purpose was not consummated has no bearing. *Hyde Park Amusement Co. v. Mogler*, 358 Mo. 336, 214 S.W.2d 541 (1948); *Young v. Hampton*, 36 Cal. 2d 799, 228 P.2d 1, 5 (1951); *Belling v. Croter*, 57 Cal. App. 2d 296, 134 P.2d 532 (1943).

If Shinn's and Kashiwa's testimony is believed, this case calls for application of the rule that the court will not serve as referee in an accounting between co-conspirators. *James v. Du Breuil*, 500 F.2d 155, 160 (5th Cir. 1974); *Morrison v. Bennett*, 20 Mont. 560, 52 P. 553, 557 (1898); *Primeau v. Granfield, supra*, 193 F. 911 (2d Cir. 1911). See also the following cases, involving suits by an inactive partner, who nevertheless is aware of the illegality, against the active partner. *Tucker v. Binenstock*, 310 Pa. 254, 165 A. 247 (1933); *Vaszaukus v. Vaszaukus*, 115 Conn. 418, 161 A. 856 (1932).

Accordingly, I would reverse and remand for further proceedings.