HANS D. WOHLSCHLEGEL, PATRICIA A. WOHL-
SCHLEGEL and ROSS KHEMLANI, Plaintiffs-
Appellees, Cross-Appellants, *v.* UHLMANN-KIHEI,
INC. and KIHEI PROPERTIES, INC., Defendants-
Appellants, Cross-Appellees, and GAH, INC., AMARAL-
COLE LAND CO., INC., dba AMARAL-COLE
REALTORS, and KARL HEYER, Defendants-Appellees

NO. 8040

(CIVIL NO. 3893)

APRIL 8, 1983

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY TANAKA, J.

Defendants Uhlmann-Kihei, Inc. (Kauhale)[1] and Kihei Properties, Inc. (Kihei) (collectively appellants), appeal the granting of summary judgment for specific performance in favor of plaintiffs Hans D. Wohlschlegel (Hans),[2] Patricia A. Wohlschlegel (Patricia) and Ross Khemlani (Khemlani),[3] the purchasers of a condominium unit in Kihei, Maui, and the dismissal of their cross-claims against co-defendants GAH, Inc. (GAH) and Amaral-Cole Land Co., Inc., doing business as Amaral-Cole Realtors (Amaral). Plaintiffs cross-appeal the trial court's refusal to award them an attorney's fee and costs, and the dismissal of their claims against GAH, Amaral and Karl Heyer (Heyer).

The issues raised on appeal are the propriety of the trial court's (1) granting plaintiffs' motion for summary judgment,

---

[1] Kauhale Makai, Inc., a Hawaii corporation, was named a defendant in the case. On or about December 1, 1981, its corporate name was changed to Uhlmann-Kihei, Inc. On February 22, 1982, this court entered its order granting a motion to amend the records to reflect such change of corporate name. However, to avoid confusion because the name of The Uhlmann Offices, Inc. (Offices), a California corporation, appears in the case, in this opinion Uhlmann-Kihei, Inc. will be referred to as "Kauhale."

[2] In his deposition, Hans D. Wohlschlegel is named Hans-Dieter Wohlschlegel.

[3] In his deposition, Ross Khemlani is identified as Rose Bhagwandas Khemlani.

(2) denying attorney's fee and costs to plaintiffs, and (3) dismissing plaintiffs' other claims and appellants' cross-claims. For the reasons stated below, we affirm the trial court's decisions, except as to the denial of attorney's fee and costs to plaintiffs.

This case (Second Circuit Civil No. 3893 below) had its genesis in Second Circuit Civil No. 3287. Civil No. 3287[4] was a mortgage foreclosure proceeding commenced on March 2, 1977 by mortgagee The Trustees of Mortgage Trust of America (MTA) against mortgagors Kauhale and Kihei[5] and another party. The mortgage covered the 168-unit Kauhale Makai condominium project (Project) in Kihei, Maui. On March 9, 1977, GAH was appointed receiver to take possession of the Project during the pendency of the foreclosure action. As receiver, GAH was vested with authority to sell units in the Project. GAH appointed Amaral as its sales agent to handle on-site sales of the Project units. Under a contract with Amaral, Heyer agreed to serve as its Project sales coordinator.

Hans and Patricia, husband and wife, and Khemlani are residents of Portland, Oregon. While vacationing on Maui with his family in December 1977, Hans obtained a sales brochure concerning the Project. After returning to Portland, Hans showed the brochure to Khemlani and discussed with him the advisability of purchasing a condominium unit together.

On February 2, 1978, Hans, with Khemlani on the extension line, telephoned Amaral's Project sales office inquiring

---

[4] As urged by the parties to this appeal, we have taken judicial notice of Civil No. 3287. Appellate courts may take judicial notice of proceedings having direct relation to the matter at issue. See Sakamoto v. Chang, 56 Haw. 447, 539 P.2d 1197 (1975); In re Ellis, 55 Haw. 458, 522 P.2d 460 (1974), cert. denied, 419 U.S. 1109, 95 S.Ct. 782, 42 L.Ed.2d 805 (1975); Sapp v. Wong, 3 Haw. App. ___, ___, 654 P.2d 883, 885-86, n.3 (1982).

[5] Kihei was the fee simple owner of the land where the condominium project is located. Kauhale had a leasehold interest in the land and was the development entity for the project. Kauhale was a wholly owned corporation of The Uhlmann Offices, Inc., which, in turn, was owned by Lionel Hayes Uhlmann, Jr. and his wife, Walker Uhlmann. The shareholders of Kihei were five trusts created by Uhlmann and his wife.

about the cheapest available unit in the Project. Heyer informed him that Apartment 127 was the cheapest available unit. On the same day, Heyer mailed to Hans a sales agreement and other papers for Apartment 127.

Prior to that, however, Lionel Hayes Uhlmann, Jr. (Uhlmann), president of Kauhale and Kihei, was concerned that real estate prices on Maui were rising and that the receiver was not increasing the sale prices for the Project units. Therefore, in December 1977 and/or in January 1978, he caused The Uhlmann Offices, Inc. (Offices)[6] to "purchase" six units in the Project. Then, on or about February 1, 1978, Offices "purchased" sixteen more units, including Apartment 127.[7]

On February 3, 1978, GAH informed Heyer that Apartment 127 "was taken off the market" because Uhlmann had sent in a deposit. In mid-February 1978, Hans and Khemlani signed and mailed the sales agreement and other pertinent papers for Apartment 127, together with Khemlani's deposit check for $1,000, to Heyer.

On March 31, 1978, when Hans telephoned, Heyer informed him that "the original developer, through Legal Manuver [sic]" had stopped the sale of the last sixteen units and that he had held on to the papers and had not cashed the deposit check for Apartment 127 "pending the settlement of the legal problem created by the original developer." Heyer sent Hans a confirmation letter to such effect on the same day.

In late April 1978, when Hans telephoned to inquire about the status of Apartment 127, Heyer told him that it seemed certain that the apartment would not be available.[8] Subsequently, Hans telephoned again and talked to Bob Cole of

---

[6] *See supra* note 5.

[7] The "purchases" were accomplished by Offices sending a $1,000 deposit for each of the 22 units.

[8] Heyer testified that he held on to the papers and deposit check for Apartment 127 waiting to see whether Uhlmann could obtain loan approvals for the 22 units which had been "purchased." Deposition of Karl Heyer at 69. Heyer felt that "there was a very strong possibility that [Apartment 127] would become available and he [Hans] could complete the purchase." *Id.* at 75. However, by late April 1978, Heyer was certain that Uhlmann would obtain financing.

Amaral who told him that Apartment 312 was available. On April 27, 1978, Hans telephoned Heyer[9] and Heyer gave him the particulars about the apartment, including its purchase price of $81,750. Hans testified when deposed that he informed Heyer that he and Khemlani were going to "take" the apartment and requested that the "particulars" be sent to them. Heyer suggested that Hans send him a letter authorizing him to alter the sales agreement for Apartment 127 to reflect the information pertaining to Apartment 312. The deposit check for Apartment 127 was to be the deposit for Apartment 312. Not receiving the letter of authorization, Heyer telephoned Hans, who stated that he and Khemlani would be in Maui on May 12, 1978 to inspect Apartment 312 and sign the papers for it.

Meanwhile, in Civil No. 3287, MTA and appellants entered into a stipulation to settle the mortgage foreclosure action. On May 1, 1978, appellants filed a motion for approval of the settlement with MTA. On the same day, a hearing on the motion was held and the Order Approving Settlement, Partially Discharging Receiver and Restoring Possession and Title to the Receivership Assets to the Defendants (Order) was filed. The Order became effective on May 4, 1978 when the release of MTA's mortgage was recorded. Paragraph 2.1.3 of the Order provided in pertinent part:

> The Receiver's power of sale shall continue and the Receiver is authorized to close all sales for which outstanding argreements with purchasers now exist according to the terms and conditions of the purchase agreements, existing escrow instructions and other applicable documents. The Receiver shall also continue to be empowered to sell and close all remaining units to back-up offerees approved by Defendants.

---

[9] In Hans' deposition of April 12, 1979 and his affidavit dated March 8, 1980 attached to plaintiffs' Motion for Summary Judgment filed on March 12, 1980, Hans stated that he called Heyer. In Heyer's deposition of June 18, 1979, Heyer testified he initiated the April 27, 1978 telephone call.

On May 12, 1978, Hans and Khemlani arrived in Maui and signed the sales agreement and other papers for Apartment 312. The agreement was signed by George Henrickson, GAH's president, on May 15, 1978.

By letter dated June 1, 1978, the attorney for appellants informed counsel for GAH that paragraph 2.1.3 of the Order required his clients' approval of the GAH-Hans and Khemlani sales agreement, but such approval had not been sought. On June 7, 1978, Heyer informed Hans and Khemlani by letter that because of the termination of the receivership involving the Project, the approval of appellants was required for the purchase of Apartment 312. On the same day, Henrickson wrote to Uhlmann seeking approval of "the new purchasers for apartment #312." By letter dated June 22, 1978, the attorney for appellants informed counsel for GAH:

> Mr. Uhlmann disapproves the sale of Apartment #312 on the terms setforth [sic] on the grounds that in the present market, the unit should be priced at $118,950.00 plus furniture package and sales tax. That such price is readily attainable and a sale of [sic] the terms proposed in Mr. Henrickson's letter would result in a loss of nearly $30,000.00 to my client.

On July 24, 1978, Henrickson wrote to the Wohlschlegels and Khemlani that the sales agreement for Apartment 312 had not been approved and offered to reimburse them some of their travel expenses to Maui. Heyer also wrote to Hans and Khemlani on July 25, 1978 that the developer had disapproved the sale of Apartment 312 to them.

On September 29, 1978, plaintiffs filed their complaint in this case seeking (1) damages from GAH for breach of the sales agreement; (2) damages from GAH, Amaral and Heyer for misrepresentation and nondisclosure of facts; and (3) specific performance of the sales agreement by appellants and special damages from them.

Appellants counterclaimed for damages due to the lis pendens filed by plaintiffs and cross-claimed against GAH and Amaral. GAH cross-claimed against Amaral and Heyer for indemnity. Amaral and Heyer cross-claimed against GAH for indemnity or, in the alternative, contribution.

On February 28, 1980, Amaral and Heyer filed a motion for

summary judgment in their favor against the other parties in the case.

On March 12, 1980, plaintiffs moved for summary judgment only as to their claim against appellants. On the same day, appellants filed their motion for partial summary judgment against plaintiffs as to the claim in the complaint against them. GAH filed no motion.[10]

After a joint hearing on all of the motions, the court entered its judgment on July 9, 1980 (1) granting plaintiffs' motion; (2) denying the motion of appellants; (3) denying the motion of Amaral and Heyer; (4) granting specific enforcement of the sales agreement dated May 15, 1978; and (5) dismissing the "claims, counterclaims and cross claims of all parties against all other parties which are not disposed of by the decree of specific enforcement in favor of plaintiffs," including plaintiffs' motion for attorney's fee and costs.

Timely appeals followed.

I.

Under Rule 56(c), Hawaii Rules of Civil Procedure (HRCP) (1981), the granting of a summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Hulsman v. Hemmeter Development Corp.*, 65 Haw. 58, 647 P.2d 713 (1982); *Bank of Honolulu v. Anderson,* 3 Haw. App. ___, 654 P.2d 1370 (1982); *King v. Ilikai Properties, Inc.,* 2 Haw. App. 359, 632 P.2d 657 (1981).

Appellants contend that plaintiffs were not entitled to summary judgment. They argue that, as a matter of law, the court should have granted their motion for partial summary judg-

---

[10] The record does not disclose any motion for summary judgment filed by GAH, Inc. However, in its Memorandum in Response to Motion for Summary Judgment filed on March 13, 1980, GAH asked the court to "grant summary judgment in its favor" against plaintiffs and against appellants on their cross-claim. (Record at 428-29.)

ment. In the alternative, they claim that the existence of genuine issues of material fact in the case precluded a summary judgment for plaintiffs.

### A.

Appellants reason thusly: (1) paragraph 2.1.3 of the Order required their approval for the sale of remaining units to back-up offerees; (2) they never approved the sales agreement for Apartment 312 between plaintiffs and GAH; and (3) as a result, there was no contract to be specifically performed by them. The soundness of such reasoning is dependent on the meaning of the second sentence of paragraph 2.1.3 of the Order which reads:

The Receiver shall also continue to be empowered to sell and close all remaining units to back-up offerees approved by Defendants.

The interpretation or construction of a judgment, decree or order "presents a question of law for the courts." *Cain v. Cain,* 59 Haw. 32, 39, 575 P.2d 468, 474 (1978). *See also Smith v. Smith,* 56 Haw. 295, 535 P.2d 1109 (1975). A trial court's interpretation or construction is not binding on an appellate court and is freely reviewable on appeal. *Nakata v. Nakata,* 3 Haw. App. 51, 641 P.2d 333 (1982); *Jendrusch v. Jendrusch,* 1 Haw. App. 605, 623 P.2d 893 (1981).

Obviously, a court order which is unambiguous and certain on its face leaves no room for construction. *Callan v. Callan,* 2 Wash. App. 446, 468 P.2d 456 (1970). The second sentence of paragraph 2.1.3 seemingly is unambiguous, but in interpreting it, appellants and plaintiffs have arrived at different results. Where the language in a court order is open to diverse interpretation, a court, perforce, must construe the order. *See* 46 Am. Jur. 2d *Judgments* § 72 (1969).

The general rule is that, like any other written instrument, a court order must "be construed reasonably and as a whole so as to give effect to the intention of the court." *Smith v. Smith, supra,* 56 Haw. at 301, 535 P.2d at 1114. In determining such intent, a court may construe the order in the context of the motion which led to the entry of the order, and "it may adopt the interpretation which renders the order more reasonable,

effective and conclusive in the light of the facts and law of the case." *Harrigan v. Mason & Winograd, Inc.*, 121 R.I. 209, 213, 397 A.2d 514, 516 (1979). In fact, an order "which is ambiguous and uncertain may be read in connection with the entire record and construed accordingly." *Benson v. State ex rel. Eyman,* 108 Ariz. 513, 515, 502 P.2d 1332, 1334 (1972). "Moreover, we must give effect not only to that which is expressed but also to that which is unavoidably and necessarily implied by the judgment or decree." *Ahuna v. Dept. of Hawaiian Home Lands,* 64 Haw. 327, 333-34, 640 P.2d 1161, 1166 (1982).

In granting plaintiffs' motion for summary judgment, the trial court construed the Order[11] favorably to plaintiffs.[12] Thus, the court must have construed the second sentence of paragraph 2.1.3 of the Order to mean (1) that a sales agreement fully executed on or before May 4, 1978 was not required for one to be deemed "a back-up offeree," but that a positive representation to purchase a unit, together with the requisite deposit, was sufficient to constitute one as a "back-up offeree" and (2) that appellants' right of approval or disapproval was not absolute but was limited to a reasonable right to approve or disapprove the "back-up offeree," not the price or other terms of sale. We hold that such construction gives effect to the intent of the court issuing the Order.

In determining the intent of the court's May 1, 1978 Order, we have reviewed the pertinent parts of the record in Civil No. 3287. We find the motion and stipulation[13] which led to the

---

[11] The May 1, 1978 Order in Civil No. 3287 was entered by Circuit Judge Kase Higa. Circuit Judge S. George Fukuoka construed the Order and granted plaintiffs' motion for summary judgment.

[12] The July 9, 1980 judgment contains no finding or conclusion as to the meaning of paragraph 2.1.3 of the Order. At the hearing on the motions on March 14, 1980, Judge Fukuoka stated, "Basically this Court feels that in ruling on the order as given by this Court on May the first, 1978, specifically with reference to the Section which provides for the Receiver to have the authorization to sell to backup buyers with approval of the Developers, this Court is going to rule . . . that the buyers in this case, the Plaintiffs do come within that provision. That is to say that the buyers' contract was permissible under the rule and that they are entitled to specific performance, . . . ." (Transcript of Proceedings held on March 14, 1980, at 3.)

[13] The parties to the stipulation dated May 1, 1978 were MTA and appellants.

entry of the Order especially helpful. *See Harrigan v. Mason & Winograd, Inc., supra; Tronslin v. City of Sonora,* 144 Cal. App. 2d 735, 301 P.2d 891 (1956).

The stipulation[14] states that the receiver GAH "has in fact sold all saleable units by entering into contracts of sale with individual buyers and caused appropriate escrows to be open [sic] to consummate said sales." As of May 1, 1978, "some of said escrows have been closed and some remain open."

Based on such facts, the court was faced with a "clean-up operation" concerning the sale of Project units. Accordingly, the court, under paragraph 2.1.3 of the Order, authorized GAH to close *all* sales of units awaiting closing in escrow and to sell and close *all* remaining units to back-up offerees approved by appellants. The court's intent was to have GAH sell and close the sale of *all* units before July 15, 1978, the expiration date of GAH's power of sale.[15]

With all saleable units having been sold, "back-up offerees" would come to the fore only with respect to units for which purchasers backed out of their sales agreements. As to such units, the court's intention was to have GAH sell them to "back-up offerees" and close such sale before July 15, 1978. There was a feeling of urgency because a supplemental public report from the Real Estate Commission had to be issued before Kauhale itself could sell and close sale of Project units.[16] Under such circumstances, the court intended a "back-up offeree" to mean a party who had accepted GAH's offer of sale of a unit which became available and had made the requisite $1,000 deposit. No signed sales agreement was necessary.

Appellants claim that under paragraph 2.1.3 of the Order, they had the right to disapprove a sale to a "back-up offeree" for the reason that the price was too low. Plaintiffs contend

---

[14] *See supra* note 4.

[15] By order entered on July 14, 1978, the court extended GAH's power of sale to August 15, 1978 or until the Real Estate Commission issued a supplemental public report allowing Kauhale to sell and close sale of units, whichever occurred first.

[16] *See supra* note 15.

that appellants' right of disapproval is only with respect to the "back-up offeree." We agree with plaintiffs.

The words of the Order are "to back-up offerees approved by Defendants." Obviously, the word "approved" modifies the term "back-up offerees." If appellants were to be accorded the right to disapprove the terms of the sale, the Order could easily have been written to so provide.[17] Further, as stated above, the facts indicate that all saleable units had been sold. Logically, then, the "back-up offerees" as of May 1, 1978 would have been offered sales terms similar to those accepted by the purchasers awaiting closing of their sales agreements in escrow. It follows that the court had no intention of allowing appellants the right to approve or disapprove sales terms to "back-up offerees."

Finally, by arguing that without their approval, there was no contract for them to specifically perform, appellants imply that their right to approve or disapprove "back-up offerees" was absolute. Citing 49 Am. Jur. 2d *Landlord and Tenant* § 423 (1970), they state that a lessor has the full and arbitrary right to refuse consent to an assignment of lease absent any restriction on such right in the lease. Likewise, since the Order contains no restrictions, they may arbitrarily disapprove "back-up offerees" with any or no reason. We cannot agree.

As stated above, construction of a court order must be reasonable so as to give effect to the court's intention. *Smith v. Smith, supra.* Thus, the automatic application of a rule utilized in construing a lease provision is inappropriate in construing the Order.

Inasmuch as the court intended to have GAH sell and close the sale of *all* units before July 15, 1978, it is inconceivable that the court intended to give appellants an absolute veto power as to "back-up offerees." The court must have intended that appellants' exercise of such right be reasonable.

The foregoing construction of the second sentence of paragraph 2.1.3 of the Order does not support appellants' contention that, as a matter of law, they, rather than plaintiffs, were entitled to summary judgment.

---

[17] The Order was prepared by counsel for appellants.

### B.

Applying the pertinent provisions of the Order, as construed above, to the uncontroverted facts in the record, we conclude that the trial court did not err in granting plaintiffs' motion for summary judgment.

First, appellants contend that there exists a genuine issue as to the meaning of "back-up offerees." The undisputed evidence is, however, that plaintiffs were "back-up offerees" for Apartment 312 as of May 1, 1978. In February 1978, Hans and Khemlani had signed and sent the sales agreement for Apartment 127 and a deposit check for $1,000 to Heyer, but that apartment was taken off the market. In late April 1978, Hans was informed of the availability of Apartment 312. On April 27, 1978, Hans told Heyer that he and Khemlani would "take" Apartment 312 with the understanding that the $1,000 deposit for Apartment 127 would be the deposit for Apartment 312. Those facts were sufficient to constitute plaintiffs as "back-up offerees" under paragraph 2.1.3 of the Order.

Second, appellants argue that even assuming plaintiffs were "back-up offerees," appellants' disapproval of the sale of Apartment 312 to plaintiffs was reasonable. However, appellants' disapproval was not in accordance with the Order and was erroneously based on the ground that "the unit should be priced at $118,950.00 plus furniture package and sales tax," rather than $81,750. As stated in part A above, appellants' right was limited to the right of approval or disapproval of the "back-up offerees," not to the offer. Based on the foregoing facts, appellants had no basis for disapproving plaintiffs as "back-up offerees." Therefore, under paragraph 2.1.3 of the Order, GAH had authority to sell Apartment 312 to plaintiffs and the sales agreement was enforceable by plaintiffs.

For the reasons stated above, the record reveals no genuine issues of material fact and plaintiffs were entitled to a summary judgment as a matter of law.

### II.

Plaintiffs' cross-appeal raises the issue of whether the trial court erred in denying them an attorney's fee and costs.

## A.

In this jurisdiction, "[n]o attorney's fees may be awarded as damages or costs unless so provided by statute, stipulation, or agreement." *Food Pantry v. Waikiki Business Plaza, Inc.,* 58 Haw. 606, 618, 575 P.2d 869, 878 (1978). *See also Rosa v. Johnston,* 3 Haw. App. 420, 651 P.2d 1228 (1982).

Plaintiffs claim that (1) the plaintiffs-GAH sales agreement provides for an attorney's fee; (2) although appellants were not signatories to the sales agreement, the Order required them to assume all "legal and contractual obligations" connected with the Project; and (3) being successful parties in the action, plaintiffs were entitled to be awarded a reasonable attorney's fee under Hawaii Revised Statutes (HRS) § 607-17 (1976).[18] We agree.

Generally, all beneficial rights under an executory contract are assignable. *See* 6 Am. Jur. 2d *Assignments* § 9 (1963); *Thompson v. Halawa Sugar Co.,* 6 Haw. 464 (1884). However, the general rule is that, in the absence of an assumption of

---

[18] HRS § 607-17 (1976) reads:

§ 607-17 Attorney's fees when provided for in promissory notes, etc. Any other law to the contrary notwithstanding, where an action is instituted in the district or circuit court on a promissory note or other contract in writing which provides for an attorney's fee the following rates shall prevail and shall be awarded to the successful party, whether plaintiff or defendant:

(1) Where the note or other contract in writing provides for a fee of twenty-five per cent or more, or provides for a reasonable attorney's fee, not more than twenty-five per cent shall be allowed;

(2) Where the note or other contract in writing provides for a rate less than twenty-five per cent, not more than the specified rate shall be allowed;

provided that the fee allowed in any of the above cases shall not exceed that which is deemed reasonable by the court.

Any law to the contrary notwithstanding, no such attorney's fee shall be allowed to the plaintiff by any court:

(1) If prior to or at the time the debt was incurred, the debtor did not sign an instrument in writing which provided for the payment of an attorney's fee; and

(2) If prior to or at the time the debt was incurred, the debtor did sign an instrument in writing which provided for the payment of an attorney's fee and such instrument in writing contains within its principal amount any attorney's fee from a prior debt.

liability, an assignment of a contract does not impose on the assignee the assignor's duties or liabilities under the contract. *Hartford Accident & Indemnity Co. v. Moraldo,* 84 Misc.2d 1082, 375 N.Y.S.2d 973 (1975); *Walker v. Phillips,* 205 Cal. App. 2d 26, 22 Cal. Rptr. 727 (1962). The assumption of the assignor's liabilities will create a contractual relationship between the assignee and the other party to the contract. 6 Am. Jur. 2d *Assignments* § 109 (1963). *See also* 4 A. Corbin, *Corbin on Contracts* §§ 866, 867 (1951).

We now apply the foregoing principles to the instant case. There is no dispute that the sales agreement provides for an attorney's fee. Paragraph 16 of the sales agreement provides, in pertinent part, as follows:

The prevailing party in a lawsuit pertaining to the subject of this Agreement including, but not limited to, a default by Buyer hereunder, shall be entitled to reasonable attorneys' fees and all costs of suit.

True, the parties to the sales agreement were GAH, as seller, and plaintiffs, as buyer, and thus appellants had no liability thereunder. We hold, however, that paragraph 2.1.5 of the Order effected an assignment of the sales agreement from GAH to appellants and an assumption of duties and liabilities thereunder by appellants. That paragraph provides:

2.1.5 Other Receivership Matters. Other than as specifically set forth above, the authority of the Receiver, the Receiver's possession of the premises and the Receiver's responsibilities for operations of the property are terminated hereby, and all such authority, possession and responsibilities are hereby returned to the Defendant corporations Kauhale Makai, Inc. and Kihei Properties, Inc., and said Defendants *shall assume and be responsible for all* expenses and *obligations* connected therewith including wages, salaries, maintenance expenses, *legal and contractual obligations* and liabilities and *all other obligations, liabilities* and expenses *connected with the project* and the Receiver shall take on no further expense for the property except as connected with the foregoing authority retained by the Receiver. [Emphasis added.]

Being the successful parties in the lawsuit, plaintiffs were entitled to a reasonable attorney's fee under HRS § 607-17.

Appellants argue that (1) HRS § 607-17 "only applies to actions on contracts, in writing, signed by the parties to be charged"; (2) appellants never signed the sales agreement; and (3) paragraph 2.1.5 of the Order is not applicable to bring them within the ambit of HRS § 607-17. This argument is fallacious.

Appellants misread HRS § 607-17. The statute refers to a "contract in writing which provides for an attorney's fee." It also provides that no attorney's fee shall be allowed to the "plaintiff" if "the debtor did not sign an instrument in writing." It does not state that the "defendant" or "a party to the action" must have signed the instrument in question. Here, the sales contract was signed by GAH (the "debtor") and this satisfies HRS § 607-17.

Our reading of paragraph 2.1.5 and the entire Order leads to the conclusion that appellants were required to assume GAH's obligations under the sales agreement and became liable for attorney's fees under HRS § 607-17. Paragraph 2.1.1 of the Order dealt with specific contractual obligations to be "assumed and honored" by appellants. Paragraph 2.1.2 referred to cash reserves to be retained by GAH and the requisite accounting by it. Paragraph 2.1.3 empowered GAH to close sale of units pending in escrow and sell and close the sale of remaining units to "back-up offerees." Paragraph 2.1.4 required appellants to honor GAH's obligations under the leaseback agreements. Paragraph 2.1.5 recited, "[o]ther than as specifically set forth above," and served as a catchall provision to deal with miscellaneous matters, including all other obligations to be assumed by appellants. We hold that as to any enforceable sales agreement not closed by GAH, appellants assumed the obligations and liabilities of GAH under paragraph 2.1.5 of the Order.

Appellants also claim that HRS § 607-17 permits a zero award for an attorney's fee to plaintiffs which the trial court in its discretion allowed.

Presumably, absent HRS § 607-17, parties to a contract providing for an attorney's fee may enforce the contractual provision according to its letter. Inequities arising from such enforcement led to the enactment of HRS § 607-17 and its

predecessors.[19] The legislative intent[20] was to provide a formula to compute an attorney's fee, but not to exceed what "is deemed reasonable by the court." Such attorney's fee was to be awarded "to the successful party, whether plaintiff or defendant."[21]

Based on such legislative intent, we do not believe that the statute allows the court to award a successful party a zero award for an attorney's fee. If the intent was to give the court full discretion in the award of an attorney's fee to the successful litigant, the legislature could have so provided in HRS § 607-17 and stated that the court "may" rather than "shall" award an attorney's fee to the successful party.

The case of *Combs v. Walters,* 518 P.2d 1254 (Wyo. 1974), cited by appellants is inapposite. In *Combs,* the promissory note sued on provided for a reasonable attorney's fee in case of default and the note was turned over to an attorney for collection. The facts indicated that the "plaintiff knew or should have known that employment of an attorney and institution of suit were not necessary." *Id.* at 1255. Under such circumstances, the appellate court found no abuse of discretion in the trial court's denial of an attorney's fee. The facts in *Combs* are very differ-

---

[19] The statute was first enacted in 1955 as Act 194, 1955 Haw. Sess. Laws 171. Act 194 applied to actions instituted in the district court only. Act 194 was codified as § 219-16.5, Revised Laws of Hawaii (1955).

Section 219-16.5 was amended in 1959 by Act 218, 1959 Haw. Sess. Laws 146 and codified as HRS § 607-17 (1968). By the 1959 amendment, it was made applicable to actions in both the district and circuit courts.

By amendment in 1972, HRS § 607-17 took its present form. *See* Act 88, § 5(s), (t), 1972 Haw. Sess. Laws 337.

[20] "The fundamental objective in construction of statutes is to ascertain and give effect to the intention of the legislature." *In re Hawaiian Telephone Company,* 61 Haw. 572, 577, 608 P.2d 383, 387 (1980); *Educators Ventures, Inc. v. Bundy,* 3 Haw. App. 435, 437, 652 P.2d 637, 638 (1982).

[21] In amending the law in 1959, the legislature felt it was unfair to permit the plaintiff to recover attorney's fee from the defendant as provided in the instrument if the plaintiff was successful "while permitting the defendant to recover only the modest attorney's commissions if the defendant obtains judgment in his favor." Thus, an amendment was made "to permit either successful party to recover attorney's fees as provided by the instrument." Senate Stand. Comm. Rep. No. 623, 30th Hawaii Terr. Leg., Reg. Sess., *reprinted in* Senate Journal 837 (1959).

ent from those of this case. Furthermore, there was no statute analogous to HRS § 607-17 involved in *Combs.*

We hold that the trial court erred in denying plaintiffs a reasonable attorney's fee.

### B.

Concerning costs, Rule 54(d), Hawaii Rules of Civil Procedure (HRCP) (1981), provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." Under Rule 54(d), the trial court has considerable discretion over the allowance of costs. *See Harkins v. Ikeda,* 57 Haw. 378, 557 P.2d 788 (1976); *Dade v. Kuhta,* 3 Haw. App. 89, 641 P.2d 989 (1982) (citing *Turner v. Willis,* 59 Haw. 319, 582 P.2d 710 (1978)). "However, the denial of costs to the prevailing party is in the nature of a penalty for some fault on his part in the course of litigation." *Bishop Trust Co., Ltd. v. Central Union Church,* 3 Haw. App. ___, 656 P.2d 1353 (1983). *See also Abreu v. Raymond,* 56 Haw. 613, 546 P.2d 1013 (1976). Our review of the record discloses no such fault on the part of plaintiffs. Thus, the trial court abused its discretion in denying costs to plaintiffs.

### III.

In the judgment entered, the trial court dismissed with prejudice "the claims, counterclaims and cross claims of all parties against all other parties which are not disposed of by the decree of specific enforcement in favor of plaintiffs." Both plaintiffs and appellants contend that the dismissal of the claims against GAH, Amaral and Heyer and the cross-claims against GAH and Amaral was improper. We disagree.

### A.

The thrust of plaintiffs' complaint was that (1) they had entered into a sales agreement for the purchase of Apartment 312; (2) they had fully performed, but Apartment 312 had not been conveyed to them; and (3) Apartment 312 was "unique and irreplaceable." In count one, they alleged that GAH had

"intentionally and maliciously failed and refused to convey" Apartment 312. In count two, they alleged that GAH, Amaral and Heyer "misrepresented and failed to disclose various facts" to them. In count three, they alleged that appellants withheld "their approval of plaintiffs as purchasers." They claimed special damages of "$80,000.00 representing their loss of the increased value" of Apartment 312. They prayed for specific performance by appellants and special, general and punitive damages from all defendants.

Plaintiffs' prime objective was to obtain specific performance of the sales agreement, which they accomplished. Having obtained title to Apartment 312, they will suffer no loss of its increased value. The undisputed evidence in the record shows no wilful or malicious conduct on the part of GAH, Amaral and Heyer. The remedy of specific performance granted to plaintiffs gave them complete relief in the case. Thus, plaintiffs' claims against GAH, Amaral and Heyer were rendered moot and were properly dismissed with prejudice. *Compare State v. Pitre,* 209 So.2d 764 (La. App. 1968).

In fact, plaintiffs agree with our analysis. In their opening brief at 21-22, they state:

> The court apparently reasoned that since the plaintiffs were being awarded specific performance of the apartment, they should be satisfied with that and should not be permitted to proceed with their claims against the remaining three defendants. *This reasoning would have prevailed were it not for the appeal filed* by defendants Kauhale and Kihei, which action exposes plaintiffs, however minimally, to the possibility of being without any recovery for the wrongs perpetrated against them by all of the defendants in the case. [Emphais added.]

## B.

Appellants' cross-claims allege that both GAH and Amaral knew that plaintiffs did not have a "back-up sales agreement" for any unit, nevertheless, they entered into a course of conduct which led to the execution of the May 15, 1978 sales agreement. They alleged that the price for Apartment 312 was below its fair market value and that GAH's and Amaral's purpose in their

conduct was to secure commissions in violation of their fiduciary duties. Appellants sought indemnity and also damages for their inability to sell Apartment 312 due to the lis pendens filed by plaintiffs.

By ruling in favor of plaintiffs below, the trial court *a fortiori* found the conduct and actions of GAH and Amaral to have been proper as a matter of law. The Order, as construed by us, authorized the sale of Apartment 312 at the price specified to plaintiffs as "back-up offerees." *See* part I of this opinion above. Appellants' cross-claims against GAH and Amaral were rendered moot by the trial court's ruling and were properly dismissed. *Compare State v. Pitre, supra.*

### C.

Plaintiffs and appellants claim that there were no motions to dismiss their claims and cross-claims before the court and, consequently, the court committed procedural error in ordering dismissal of the claims and cross-claims.

Here, plaintiffs sought the aid of a court of equity for the remedy of specific performance. Equity serves "to give such relief as justice and good conscience require" and its province is "to afford full relief and to protect all rights." *Sokolowski v. Peoples Savings & Loan Ass'n of Battle Creek,* 23 Mich. App. 609, 613, 179 N.W.2d 197, 199 (1970). *See also Gabe v. City of Cudahy,* 52 Wis.2d 13, 187 N.W.2d 874 (1971); *George v. W-G Fertilizer, Inc.,* 205 Kan. 360, 469 P.2d 459 (1970). Our supreme court has stated that "the court of equity has plenary power to mold its decrees in such form as to conserve the equities of all parties * * *." *Fleming v. Napili Kai, Ltd.,* 50 Haw. 66, 70, 430 P.2d 316, 319 (1967) (quoting from *Baker Sand & Gravel Co. v. Rogers P. & H. Co.,* 228 Ala. 612, 619, 154 So. 591, 597, 102 A.L.R. 346, 355 (1934)); *Schrader v. Benton,* 2 Haw. App. 564, 566, 635 P.2d 562, 564 (1981). Furthermore, "[t]he relief granted in equity is dictated by the equitable requirements of the situation, and must be adapted to the facts and circumstances of the particular case." *Shinn v. Yee, Ltd.,* 57 Haw. 215, 235, 553 P.2d 733, 746 (1976).

Rule 1, HRCP (1981), requires construction of the rules "to secure the just, speedy, and inexpensive determination of

every action." Further, HRS § 603-21.9(6) (1976) provides:

The several circuit courts shall have power:

(6) *To make and award such judgments,* decrees, orders, and mandates, issue such executions and other processes, and do such other acts and take such other steps *as may be necessary* to carry into full effect the powers which are or shall be given to them by law or *for the promotion of justice in matters pending before them.* [Emphasis added.]

Applying the foregoing principles, we hold that the lower court properly exercised its authority, under the circumstances, in dismissing plaintiffs' claims against GAH, Amaral and Heyer and appellants' cross-claims against GAH and Amaral. *Compare City of Hazard v. Baker,* 419 S.W.2d 535 (Ky. 1967).

We affirm the granting of plaintiffs' motion for summary judgment and the dismissal of plaintiffs' other claims and appellants' cross-claims. The denial of an attorney's fee and costs to plaintiffs is reversed.

Remanded for further proceedings in accordance with this opinion.

*Michael D. Wilson (James E.T. Koshiba; Koshiba & Young,* of counsel; and *Alexander T. MacLaren; Chung, Lau, MacLaren & Lau,* of counsel, on the briefs) for defendants-appellants and cross-appellees.

*Edward F. Mason (Mason and Scott,* of counsel) for plaintiffs-appellees and cross-appellants.

*Howard R. Green (Ke-Ching Ning* also on the brief; *Carlsmith, Carlsmith, Wichman and Case,* of counsel) for defendant-appellee GAH, Inc.

*Clyde Wm. Matsui* for defendants-appellees Amaral-Cole Land Co., Inc. and Karl Heyer.